Filed 7/14/16  Downtown Fresno Coalition v. City of Fresno CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DOWNTOWN FRESNO COALITION,<br><br>    Plaintiff and Appellant,<br><br>          v.<br><br>CITY OF FRESNO,<br><br>    Defendant and Respondent. | F070845<br><br>(Super. Ct. No. 14CECG00890)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Dennis A. Peterson, Judge.

Law Office of Sara Hedgpeth-Harris and Sara Hedgpeth-Harris; Chatten-Brown & Carstens, Amy C. Minteer and Michelle N. Black for Plaintiff and Appellant.

Aleshire & Wynder, Anthony R. Taylor, John W. Fox, Mark W. Steres, and Lara R. Leitner; Douglas T. Sloan, City Attorney, Francine M. Kanne, Chief Assistant City Attorney, for Defendant and Respondent.

-ooOoo-

## INTRODUCTION

This is an appeal from a judgment of the Superior Court of Fresno County denying the writ petition of appellant Downtown Fresno Coalition (Coalition).

The Fulton Mall (Mall) in the heart of downtown Fresno is comprised of " 'city streets,' or portions thereof, on which vehicular traffic is . . . restricted in whole or in part and which . . . [are] used exclusively or primarily for pedestrian travel." (Sts. & Hy. Code, § 11006.)  Respondent City of Fresno (City) seeks to "reconstruct [the] Mall as a complete street by reintroducing vehicle traffic lanes . . . ."  Pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] and the Guidelines,[2] City prepared a draft environmental impact report (EIR) for this proposed Fulton Mall Reconstruction Project (Project).  Following circulation of the draft EIR for public review and completion of a final EIR, the Fresno City Council (City Council) certified the final EIR, made written findings for each significant environmental effect identified, and approved the Project on February 27, 2014.  Coalition challenged these actions and petitioned for a writ of mandamus on March 28, 2014.  After a hearing on the matter, the superior court denied the petition on October 21, 2014.

On appeal, Coalition makes two principal arguments.  First, City approved the Project before it conducted CEQA review.  Second, the EIR was deficient.  Specifically, Coalition alleges the report did not include (1) a legally adequate analysis of the Project's

---

[1]     Unless otherwise indicated, subsequent statutory citations refer to the Public Resources Code.

[2]     The Guidelines refer to California Code of Regulations, title 14, section 15000 et seq.  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 (*Laurel Heights I*).)  They are authorized by CEQA (§ 21083) and accorded great weight in interpreting the statute except where they are clearly unauthorized or erroneous (*Sunset Sky Ranch Pilots Assn. v. County of Sacramento* (2009) 47 Cal.4th 902, 907, fn. 3).

impacts on air quality, greenhouse gas emissions, parks, traffic, and utilities; and (2) a comparative assessment of the Project's "traditional street" and "vignettes" options.

For the reasons set forth in this opinion, we reject these contentions and affirm the judgment.

## FACTUAL HISTORY

Between the late 19th and mid-20th centuries, Fulton Street was City's commercial epicenter, a downtown thoroughfare lined with numerous retailers, including J.C. Penney, Sears, Gottschalks, and Montgomery Ward. By the 1950's, however, Fulton Street as well as the urban core at large experienced economic decline as a result of suburbanization. In 1958, City hired architecture firm Victor Gruen Associates (Gruen) to formulate a strategy to revitalize the core. Gruen proposed, inter alia, a pedestrian mall on Fulton Street. On January 16, 1964, pursuant to the Pedestrian Mall Law of 1960 (Sts. & Hy. Code, § 11000 et seq.), City Council passed an ordinance establishing the Mall.

The Mall is situated on a six-block-long portion of Fulton Street bounded by Tuolumne Street to the northwest, Van Ness Avenue to the northeast, Inyo Street to the southeast, and Broadway Street and H Street to the southwest. Within these borders, Fulton Street, which runs parallel with Van Ness Avenue, intersects Merced Street, Fresno Street, Mariposa Street, Tulare Street, and Kern Street. Fulton Street, Merced Street, Mariposa Street, and Kern Street are pedestrianized,[3] but Fresno Street and Tulare Street remain open to motor vehicles.

The Mall officially opened to the public on September 1, 1964. As conceived by landscape architect Garrett Eckbo, the Mall featured stained concrete pavement inlaid with curvilinear ribbons of concrete aggregate; planting beds with shade trees, shrubs,

---

**3**    Many documents in the administrative record omit the street suffix when they identify a specific pedestrianized segment of the Mall, i.e., "Fulton" for Fulton Street, "Mariposa" for Mariposa Street, "Merced" for Merced Street, and "Kern" for Kern Street. We employ these truncations in this opinion where appropriate.

and flowers; water fountains, pools, and streams; shade pavilions, sitting areas, and "tot lot" playgrounds; and sculptures and mosaic artwork. Foot traffic increased, which stimulated and stabilized downtown retail activity for the rest of the decade. In addition, Eckbo's design garnered critical acclaim and recognition from both the American Institute of Architects and the United States Department of Housing and Urban Development (HUD).

The revitalization spurred by the Mall petered out in the 1970's as suburbanization continued. Downtown patronage further plummeted after major retailers relocated from the Mall to the periphery.[4] In 1989, City pinpointed various problems with the Mall in its Central Area Community Plan,[5] including the lack of accessible parking, poor maintenance, inadequate security, and the influx of vagrants. City concluded "[t]he function of the . . . Mall . . . as envisioned by . . . Gruen . . . was not realized and there is no consensus as to its present function or future role." Over 20 years later, an urban decay study found the Mall and its vicinity sustained "economic disinvestment," manifested in "high vacancy rates, low lease rates, low retail sales, high crime rates, and deteriorating physical conditions."

On October 14, 2011, City released a draft of its Fulton Corridor Specific Plan (FCSP).[6] The FCSP considered the Mall "key to revitalizing Downtown Fresno" and

---

[4]     Montgomery Ward, J.C. Penney, and Gottschalks left the Mall in 1970, 1986, and 1988, respectively. Sears relocated before the Mall was established.

[5]     "Central Area" refers to the area surrounded by State Routes 41, 99, and 180. The Mall is within these borders.

[6]     "Fulton Corridor" refers to the area "generally bounded to the north by Divisadero Street, to the west by State Route 99, to the south by State Route 41, and to the east by N Street, O Street, and the alley between M and N Streets." The Mall is within these borders.

The FCSP, along with the Downtown Neighborhoods Community Plan (DNCP) and Downtown Development Code (see at p. 8, *post*), would replace the Central Area Community Plan.

described three "Mall options" to help "restor[e] . . . the Fulton Corridor into a prosperous, vibrant place," each to be "studied in greater detail by [an EIR] prepared for th[e] [FCSP]":

> "[Option 1:] **Reconnect the Grid on Traditional Streets.** Completely remove the existing Mall and introduce a narrow, two-lane, two-way enhanced street with oversize sidewalks, stately trees, and on-street parking . . . throughout the . . . Mall and its cross streets.

> "[Option 2:] **Reconnect the Grid with Vignettes.** Introduce a two-way street through the . . . Mall, keeping selected original features in their original Mall contexts ('vignettes'), in a manner that provides improved retail visibility and some on-street parking. Transform Kern, Mariposa[,] and Merced into enhanced streets with narrow traffic ways, ample sidewalks, stately trees, and on-street parking.

> "[Option 3:] **Restoration and Completion.** Keep Fulton . . . , Merced . . . , Mariposa . . . , and Kern . . . pedestrian-only. Renovate and repair them in their entirety, including their landscape and hardscape, and restore the artwork."

Of the three Mall options, Option 2 was identified as City's preference because it "offers a balance of significantly improving the economic function of Fulton,[7] while preserving key features of the existing landscape." Nonetheless, the FCSP noted (1) Options 1 and 3 were viable choices to be "environmentally assessed at a high level of detail as alternatives to Option 2"; and (2) "[a]s part of the [FCSP] adoption process, the City Council will evaluate and consider all of these [Mall] options and select one for inclusion in the final, adopted [FCSP]."[8]

---

**7** The FCSP projected annual gross retail sales of (1) $32.1 million if the Mall were left alone; (2) $79.1 million if Option 1 were implemented; (3) $55.4 million if Option 2 were implemented; and (4) $38.2 million if Option 3 were implemented.

**8** Prior to the release of the draft FCSP, the mayor remarked:

> "[The] Mall is the linchpin to successful revitalization. While we should not be thinking of [the] Mall as a 'silver bullet' to revitalization, we should be thinking of it as the first major domino of revitalization that will have a ripple effect throughout the entire [Fulton] [C]orridor. . . . [¶] . . . [¶]

5.

Sometime thereafter, City requested $4 million in Transportation, Community, and System Preservation Program (TCSP) funds from the Federal Highway Administration (FHWA) for the fiscal year 2012. City's application specified:

> "The [P]roject is the reconstruction of four blocks of streets in the heart of Downtown Fresno, including lighting and bicycle and pedestrian improvements. The [P]roject is located on . . . Fulton . . . between Fresno and Tulare Streets . . . and the two blocks of Mariposa . . . between Van Ness Avenue and Broadway Plaza . . . that intersect Fulton at its midpoint. These streets have been closed to vehicle traffic since 1964. TCSP funds will support all phases of the [P]roject, from preliminary engineering through reconstruction. [¶] . . . [¶]

> ". . . The [P]roject sits at the heart of the City's major ongoing downtown planning effort, the [FCSP]. A primary goal of the [FCSP], and in particular of this [P]roject as a[n] [FCSP] implementation measure, is to resuscitate the economy of what was once the 'Main Street' for [the City] and the surrounding four-county area. The area's 1.6 million residents today are unserved by a vibrant, healthy urban center anywhere in the region, and the desirability of the entire region is hindered by the lack of this amenity. The economic impacts of downtown revitalization therefore extend well beyond the streets affected and the Downtown area alone. Downtown revitalization is now the City['s] . . . core economic development strategy.

> ". . . Mobility and connectivity play an important role in any downtown's economic vitality, and the lack of multimodal access has hurt the economy of [the] Mall. . . . [¶] . . . [¶] . . . Studies for the [FCSP] estimate that a

---

> ". . . [R]econnecting the grid with traditional streets presents the best economic benefits to the [C]ity. Restoration and completion presents the best cultural benefits to the City. Reconnecting the grid with vignettes attempts to take the best attributes from [O]ptions 1 and 3. [¶] For this reason, I am recommending that the preferred alternative for the . . . Mall be Option . . . 2 . . . . [¶] . . . [¶]

> ". . . I want to be clear that, while I am making the [Mayoral] Administration's recommendation for the preferred alternative known today, all three [Mall] options will be fully evaluated in the EIR process. All three options will be equally weighted. Ultimately, the City Council will vote to adopt the [FCSP], including their chosen alternative for the future of the Mall. . . ." (Some capitalization omitted.)

traditional street would improve retail sales along [the] Mall by 143[ percent] within five years. [¶] . . . [¶]

". . . One of the primary strategies in the [FCSP] to encourage investment and development is to revitalize the . . . Mall through improvements to its form and function. Numerous private sector developers have identified circulation on Fulton and its cross streets as necessary for significant investment in the area. [¶] . . . [¶]

". . . The [P]roject introduces complete street improvements on Fulton . . . and Mariposa . . . , with approximately half the 80-foot right-of-way dedicated to automobiles and bicycles, and half to pedestrians, including lighting and other systems to benefit all modes. . . ."

The FHWA subsequently awarded $1 million in TCSP funds.

On March 8, 2012, City's staff asked City Council to approve a resolution allowing City to apply for $2 million in Measure C Transit Oriented Development (TOD) funds "to support engineering and environmental work related to the reconstruction of [the] Mall . . . ." City's staff advised:

"The ultimate decision with regard to the . . . Mall's future will be made by the [City] Council through the adoption of the [FCSP] and supporting environmental study. It is the [Mayoral] Administration's goal to be ready to implement the [City] Council's decision as soon as possible after the [FCSP] is adopted, a step which will require a significant amount of detailed design and engineering work. Meanwhile, with the City's budget pressures in mind, the Administration hopes to maximize the contributions of funding from sources other than the City['s] General Fund to support the necessary preconstruction and construction work.

"Consistent with the fact that the [City] Council has not yet determined the future status of the . . . Mall, the proposed grant will advance the City's engineering and cost estimates for Mall options ranging from a transformation back to a traditional street to the restoration of the existing pedestrian mall design. Ultimately the [City] Council may approve a different proposal for [the] Mall besides the three options identified in the [FCSP]; therefore, the approval of this resolution does not commit the [City] Council to any of the proposals currently set forth in the draft [FCSP]. The proposed grant funds will not be used for construction, and the proposed grant-funded design and engineering work does not commit the City to any future action to implement any construction activities."

7.

City Council approved the resolution. City applied for and received $474,810 in TOD funds.

On or before March 19, 2012, City commenced the process to add the Mall to the Federal Transportation Improvement Program and the Fresno Council of Governments (COG) Regional Transportation Plan (RTP).

In April 2012, City issued a notice of preparation (NOP) demonstrating its intent to prepare an EIR for the FCSP, the DNCP, and the Downtown Development Code.[9] The NOP reiterated the three Mall options mentioned in the draft FCSP "will be assessed in the EIR."[10]

Later, the United States Department of Transportation (DOT) announced the availability of Transportation Investment Generating Economic Recovery (TIGER) grants for the fiscal year 2013.[11] The "Notice of Funding Availability" specified:

"**I. Background** [¶] . . . [¶]

". . . TIGER Discretionary Grants are for capital investments in surface transportation infrastructure and are to be awarded on a competitive

---

[9] The DNCP would be a "highly articulated and informed extension" of City's General Plan, "ma[king] tangible and ready to implement" "[t]he General Plan's direction to generate activity centers and focus reinvestment in the center of the City" and "provid[ing] policy direction for the FCSP . . . Area and the neighborhoods that surround it." The Downtown Development Code would implement the goals and policies of the FCSP.

[10] City initially hired environmental planning services firm Michael Brandman Associates to prepare the EIR for the FCSP. Later, another company, FirstCarbon Solutions, became the lead consultant and eventually prepared the EIR for the Project, apparently in conjunction with Michael Brandman Associates. City indicated this change stemmed from circumstances beyond its control. (See at p. 46, *post*.)

City also asked its designer, landscape architecture firm Royston, Hanamoto, Alley & Abey, to consider all three Mall options, inter alia. Royston, Hanamoto, Alley & Abey provided its insights on these options in an "Alternatives Analysis Report" dated November 13, 2013, which is in the record.

[11] City unsuccessfully applied for a TIGER grant for the fiscal year 2012.

basis for projects that will have a significant impact on the Nation, a metropolitan area, or a region. . . . [¶] . . . [¶]

". . . To be funded, projects or elements of a project must have independent utility, which means that the project provides transportation benefits and is ready for its intended use upon completion of project construction. [¶] . . . [¶]

"For projects receiving a TIGER Discretionary Grant, federal funds (including the TIGER Discretionary Grant and any other federal discretionary or formula funds) may be used for up to 80 percent of the costs of the project. . . . [P]riority must be given to projects that use TIGER Discretionary Grant funds to complete an overall financing package, and . . . projects can increase their competitiveness for the purposes of the TIGER program by demonstrating significant non-federal financial contributions. . . . DOT will consider any non-federal funds, whether such funds are contributed by the public sector (State or local) or the private sector, as a local match for the purposes of this program. . . .

". . . TIGER funds are only available for DOT to obligate through September 30, 2014. The limited amount of time for which the funds will be made available means that DOT, when evaluating applications, must focus on whether or not a project is ready to proceed with obligation of grant funds within the limited time provided. . . . TIGER funding expires automatically after the deadline of September 30, 2014, if DOT does not obligate these funds. This deadline is provided in law and waivers cannot be granted under any circumstances. [¶] . . . [¶]

"**II. Selection Criteria and Guidance on Application of Selection Criteria** [¶] . . . [¶]

"**A. Primary Selection Criteria**

"DOT will give priority to projects that are ready to proceed quickly and have a significant impact on desirable long-term outcomes for the Nation, a metropolitan area, or a region. . . . DOT is elevating project readiness as a primary selection criterion for this round of TIGER Discretionary Grants due to the legislatively-mandated timeline for obligation of TIGER Discretionary Grant funds. . . . [¶] . . . [¶]

". . . **Project Readiness:** For projects that receive funding in this round of TIGER, DOT is required to obligate funds to those projects by September 30, 2014, or the funding will expire. Priority will be given to projects that can meet all local, State, and federal

requirements by June 30, 2014.  This is a shorter period of time for obligation of funds than the comparable period for any prior round of TIGER, and is therefore a primary concern to DOT that will be treated as such during the evaluation and selection process. . . . [¶] . . . [¶]

"**C.  Additional Guidance on Evaluation**  [¶] . . . [¶]

". . .  **Other Environmental Reviews and Approvals**

". . .  An application for a TIGER Discretionary Grant must detail whether the project will significantly impact the natural, social[,] and/or economic environment.  The application should demonstrate receipt (or reasonably anticipated receipt) of all environmental approvals and permits necessary for the project to proceed to construction on the timeline specified in the project schedule and necessary to meet the statutory obligation deadline, including satisfaction of all federal, State, and local requirements . . . . You should submit the information listed below with your application:  [¶] . . . [¶]  . . . [e]nvironmental studies or other documents . . . that describe in detail known project impacts, and possible mitigation for those impacts.  [¶] . . . [¶]

". . .  Support from all relevant State and local officials is not required; however, you should demonstrate that there are no significant legislative barriers to timely completion, and that the project is broadly supported.  [¶] . . . [¶]

"**IV.  Grant Administration**

"DOT expects that each TIGER Discretionary Grant will be administered by one of the Relevant Modal Administrations, pursuant to a grant agreement between the TIGER Discretionary Grant recipient and the Relevant Modal Administration. . . ."

"**SUPPLEMENTARY INFORMATION:**  [¶] . . . [¶]

". . .  [T]he statutory timeframe for DOT to obligate funds under this round of TIGER Discretionary Grants is the shortest of all of the rounds to date.  In order to meet this deadline, your application must demonstrate that . . . the project can meet all local, State, and federal requirements by June 30, 2014, in order for DOT to obligate funding in advance of September 30, 2014.  Each application must include a detailed statement of

10.

work, detailed project schedule, and detailed project budget. Due to the short timeframe for obligation, project readiness and the risk of delays will be treated as primary selection criteria in DOT's evaluation process."

The application submission period opened April 29, 2013, and closed June 3, 2013.

City requested a $15,924,620 TIGER grant. City's application specified:

"The . . . [P]roject proposed in this application will address the transportation problem that underlies [the] Mall's stubborn economic challenges. Research by leading experts in urban revitalization shows that the lack of multimodal access for the buildings along Fulton makes it difficult to attract sufficient investment to revitalize this area. One national survey found that 90[ percent] of downtowns with pedestrian malls became successful when they reopened the malls to vehicles while retaining pedestrian amenities. A complete street that mixes travel modes, as opposed to a limited-mode pedestrian mall, is the best way to maximize 'eyes on the street' and foot traffic. Several factors have led to the decline of Downtown Fresno over the decades, but transportation issues—visibility and access—are by far the greatest factors today in the . . . Mall's persistently and acutely anemic economy. [¶] . . . [¶]

". . . $4 million in nonfederal funds[, i.e., $250,000 in private funds and $3,750,000 in local public funds,] is committed to this [P]roject. . . . [¶] . . . [¶]

"The . . . [P]roject is to reconstruct the . . . Mall . . . as a complete street by reintroducing vehicle traffic lanes to the existing pedestrian mall. The affected rights-of-way include the pedestrian areas between buildings located on the former City streets of Fulton, Mariposa, Merced[,] and Kern, which function as an integrated pedestrian mall. . . .

"The . . . [P]roject has two build [options]. [Option ]1 consists of reopening the Mall with two-way streets, with one lane of vehicular traffic in each direction alongside bicycle and pedestrian modes. One 11[-]foot vehicle travel lane would run in each direction, with a parallel parking lane of [nine] feet on both sides of the streets. A 20[-]foot sidewalk on both sides of the streets would allow for walking and seating, landscaping, lighting, and public art.

"[Option ]2 consists of reconnecting the street grid as in [Option ]1, but would include rebuilding distinctive elements of the Mall in five to six specific locations, known as 'vignettes.' Within the vignettes there would be no parking lane, and the existing Mall landscape elements (sculptures, fountains, pavement pattern, trees, etc.) would be kept maximally intact.

11.

One 11-foot vehicle travel lane would run in each direction and would bend and curve through the vignettes. Outside the vignette areas the street would straighten, and the landscape would include a [nine-]foot parallel parking lane and a pedestrian-only walking, seating, vegetation, and public art area 20 feet in width on one or both sides of the street. The remaining space on each side of the street would be dedicated to pedestrian travel, seating, vegetation[,] and artwork. [¶] . . . [¶]

"A preliminary engineer's estimate has been prepared, providing a detailed breakdown of the [P]roject's costs. The estimated total construction cost is $19,924,620. . . . [¶] . . . [¶]

"This application seeks funding only for the construction phase of the . . . [P]roject. . . . Already the [P]roject's preconstruction phase has been awarded $1 million from FHWA's . . . TCSP . . . program, and $474,810 from the local . . . TOD . . . program. . . . [¶] . . . [¶]

"Review[] of the [P]roject under . . . CEQA . . . [is] ongoing. [¶] . . . [¶] The majority of work . . . has been completed, and draft documents are expected to be circulated to the public in the fall of 2013. . . . [¶] . . . [¶] . . . This application seeks TIGER funding for construction costs only, not preconstruction costs such as environmental analysis. [¶] . . . [¶]

"Legislative approval from the . . . City Council will be necessary to enter contracts and expend construction funds.[12] Under California law, such approval may not be obtained until environmental impact analysis is complete. City Council adoption actions are expected to occur by March 2014, once this review is complete.[13]" (Fns. omitted.)

Attached to the application were numerous letters of support from the mayor, federal and state officials, property and business owners, and community leaders. None were from City Council.

_____

**12** Pursuant to City's charter, City Council is vested with all powers of legislation in municipal affairs. (Fresno City Charter, article V, § 500.)

**13** City's TIGER application outlined the following timeline: (1) completion of the draft EIR in August 2013; (2) circulation of the draft EIR for public review from September 2013 to November 2013; and (3) certification of the final EIR and approval of the Project by City Council in March 2014.

On June 20, 2013, City's staff asked City Council to approve a resolution accepting $1 million in TCSP funds. City's staff advised (1) acceptance of TCSP funds did not commit City to a particular option for the Mall; (2) FHWA "had the ability to call for the return/payback of [TCSP] funds if the [P]roject does not go to construction within 10 years"; (3) "there was no General Fund money involved"; and (4) the TCSP funds "would be matched with . . . TOD funds."[14] Following deliberation, City Council approved the resolution "accept[ing] . . . grant funding from the FHWA to support the preliminary engineering of the . . . Mall . . . ." The resolution's preamble stated City "will enter into an agreement with the FHWA for development of the [P]roject."

In September 2013 DOT awarded the nearly $16 million TIGER grant to City.

On October 15, 2013, City issued an NOP demonstrating its intent to prepare an EIR only for the Project. An initial study released concurrently determined the Project may "[s]ubstantially degrade the existing visual character or quality of the [Mall] and its surroundings" and "[c]ause a substantial adverse change in the significance of a historical resource." By contrast, impacts on air quality, greenhouse gas emissions, parks, traffic, and utilities were deemed less than significant:

"**3.3 – Air Quality** [¶] . . . [¶]

"**Air Quality Plan** [¶] . . . [¶]

"**Project Impacts**

"[*Option*] *1* [¶] **Less than significant impact.** The SJVAPCD[15] specifies that a project is conforming to the applicable attainment or maintenance plan if it: [¶] 1. Complies with all applicable SJVAPCD rules and regulations, [¶] 2. Complies with all applicable control measures from the applicable plans, and [¶] 3. Is consistent with the growth forecast in the applicable plans. [¶] . . . [¶]

---

**14** The TCSP award required $200,000 in nonfederal matching funds.

**15** "SJVAPCD" refers to the San Joaquin Valley Air Pollution Control District.

"Under the first criterion, a project needs to comply with all applicable SJ[V]APCD rules and regulations. Compliance with adopted SJVAPCD rules and regulations is a requirement under the law, and therefore, the implementation of [Option] 1 will comply with all adopted SJVAPCD rules and regulations. The applicable rules and regulations are described above.[16] [Option] 1 would comply with the first criterion.

"The second criterion states that a project must comply with all applicable control measures from the applicable SJVAPCD attainment plans. These attainment plans include the 2004 Extreme Ozone Attainment Demonstration Plan, 2007 Ozone Plan, 2007 $PM_{10}$ Maintenance Plan, . . . 2008 $PM_{2.5}$ Plan, and 2012 $PM_{2.5}$ Plan. . . .[17]

"The 2004 Extreme Ozone Attainment Demonstration Plan includes control measures to reduce a precursor of ozone, $NO_x$, including $NO_x$ reductions from indirect sources.

"The 2007 Ozone Plan contains measures to reduce ozone and particulate matter precursor emissions to bring the [San Joaquin Valley] Air Basin into attainment wit[h] the federal [eight]-hour ozone standard.

"The 2007 $PM_{10}$ Maintenance Plan ensures the San Joaquin Valley[] will continue to attain the EPA's [(Environmental Protection Agency)] $PM_{10}$ standard.

"The 2008 $PM_{2.5}$ Plan builds upon the strategy adopted in the 2007 Ozone Plan to bring the Air Basin into attainment of the 1997 national standards for $PM_{2.5}$. This Plan is a continuation of the SJVAPCD's strategy to improve the air quality in the Air Basin.

"The 2012 $PM_{2.5}$ Plan addresses EPA's most recent 24-hour standard of 35 ug/m$^3$.

"The applicable control measures have been adopted as SJVAPCD rules and regulations. Therefore, implementation of [Option] 1 will comply with

---

**16** These included Rule 4002 (National Emission Standards for Hazardous Air Pollutants), Rule 4102 (Nuisance), Rule 4641 (Cutback, Slow Cure, and Emulsified Asphalt, Paving and Maintenance Operations), Regulation VIII (Fugitive $PM_{10}$ Prohibitions), Rule 9120 (Transportation Conformity), and Rule 9510 (Indirect Source Review).

**17** See footnote 18, *post*.

all adopted SJVAPCD rules and regulations and thus . . . the applicable control measures. [Option] 1 would comply with the second criterion.

"Finally, the Project is consistent with the growth forecast in the San Joaquin Valley Air Quality Attainment Plan. The proposal for [the] Mall to reintroduce two-way, two-lane street within [the] Mall and designate the streets as collector streets has been included in the approved 2011 RTP Amendment #2 as Project ID FRE500768. The 2011 RTP has control measures to reduce emissions from on-road sources by incorporating strategies such as high occupancy vehicle interventions, transit, and information-based technology interventions. These measures that have been implemented by the California Air Resources Board [(ARB)] and Fresno COG affect [Option] 1 indirectly by regulating the vehicles that the residents and patrons may use and regulating public transportation. The control measures would not directly apply to the construction and operation of [Option] 1. Since the [Project], including [Option] 1, is included in the approved RTP, [Option] 1 is consistent with the growth forecast for the region. Furthermore, the implementation of [Option] 1 would not propose any additional traffic generating land uses. [Option] 1 would result in the re-distribution of existing traffic volumes in the vicinity of [the] Mall, but the [P]roject will not directly increase traffic volumes. [Option] 1 would comply with the third criterion.

"[*Option*] *2* [¶] **Less than significant impact.** The determination of less than significant impact on conflicting with the applicable air quality plan as described above for [Option] 1 would be the same for [Option] 2.

"*Cumulative Impacts*

"**Less than significant impact.** As identified above, the SJVAPCD prepared attainment and maintenance plans to bring the Air Basin into attainment with the ambient air quality standards. As cumulative development occurs throughout Downtown Fresno, each development will be required to comply with the SJVAPCD rules and regulations. Furthermore, each development will be required to be consistent with the growth forecasted and accounted for in the SJVAPCD attainment and maintenance plans. As stated above, the implementation of [Options] 1 or 2 will conform to the applicable attainment and maintenance plans. Cumulatively, [Options] 1 or 2 in conjunction with cumulative development within Downtown Fresno is expected to result in less than significant cumulative impacts on the applicable air quality plan. Furthermore, development of [Option] 1 or 2 would contribute less than cumulatively significant impacts on the applicable air quality plan.

15.

"**Air Quality Standards/Violations** [¶] . . . [¶]

"**Project Impacts**

"**[*Option*] *1*** [¶] **Less than significant impact.** Since criteria pollutants are pollutants with ambient air quality standards, analysis within this section is related to construction and operational criteria pollutant impacts.

"*Construction Pollutants*

"**Thresholds** [¶] The . . . SJVAPCD . . . provides recommended significance thresholds in their Guide for Assessing and Mitigating Air Quality Impacts . . . . The SJVAPCD's thresholds are provided in Table 7.[18] The SJVAPCD's thresholds are utilized for the majority of CEQA impact analysis . . . . [¶] . . . [¶]

"*Construction Emissions* [¶] Construction emissions can vary substantially from day to day, depending on the level of activity, the specific type of activity, and the prevailing weather conditions. The methodology developed for the purposes of this quantitative air quality analysis was based on information available at the time of analysis; actual equipment and activity intensity at the time of construction may vary from those analyzed in this document. However, it is anticipated that the level of activity analyzed is representative of activities that will occur during construction. The main sources of air pollutants associated with the Project include off-road construction equipment exhaust, worker trips, and fugitive $PM_{10}$ and $PM_{2.5}$ emissions. The annual emissions for [P]roject demolition activity were estimated using CalEEMod [(California Emissions Estimator Model)]. The annual emissions for [P]roject construction were estimated using the Roadway Construction Emissions Model, version 7, developed by Sacramento Metropolitan Air Quality Management District. The assumed construction phase durations are shown in Table 8 and Table 9.[19] [¶] . . . [¶]

---

**18** These annual thresholds are 10 tons for oxides of nitrogen ($NO_x$); 10 tons for reactive organic gases (ROG); 15 tons for particulate matter ($PM_{10}$); and 15 tons for particulate matter ($PM_{2.5}$).

**19** The projected construction durations for Fulton are 15 working days for demolition, 30 working days for soil excavation and export, 60 working days for storm drain replacement, 30 working days for curb and gutter, 30 working days for asphalt and rock, and 60 working days for sidewalk.

The projected construction durations for Mariposa, Merced, and Kern are 10 working days for demolition, 19 working days for soil excavation and export, 30 working

16.

"Based on the following roadway widths and lengths to be improved and the Project layout, the emissions analysis assumed the following construction activity:

"**Fulton** . . . . [¶] . . . Approximately 2,747 feet of length (0.52 mile) would be paved, [¶] . . . Approximately 5.0 acres would be disturbed during the course of the Fulton . . . construction, [¶] . . . A maximum of 0.1 acre would be disturbed on any one day, [¶] . . . Project construction would begin in 2014,

". . . Demolition would result in 6,867 tons of material removed; 18 tons per truck, 382 one-way trips for materials hauling; average [eight]-miles per one-way trip for a total of 6,112 truck trip miles[,]

". . . Soils Excavation [¶] . . . Option 1 soils excavation would result in 4,477 cubic yards (cyd) of materials; 16 cyd per truck at [eight] miles per one-way trip for a total of 4,480 soils hauling truck miles. [¶] . . . Option 2 soils excavation would result in 4,070 cyd of materials; 16 cyd per truck at [eight] miles per one-way trip for a total of 4,070 soils hauling truck miles.

". . . Storm Drain replacement would result in 2,440 cyd of onsite materials movement with no export or import,

". . . Curb and Gutter would result in 286 cyd of soils removal, at [eight] cyd per truck and [eight] miles per one-way trip for a total of 288 on-road hauling miles, [¶] . . . [¶]

". . . Rock [¶] . . . Option 1 . . . would result in emplacement of 3,000 cyd (5,264 tons) of rock; 20 tons per truck at [eight] miles per one-way trip for 4,208 miles of rock hauling trips. [¶] . . . Option 2 . . . would result in emplacement of 2,727 cyd (4,785 tons) of rock; 20 tons per truck at [eight] miles per one-way trip for 3,840 miles of rock hauling trips.

". . . Asphalt [¶] . . . Option 1 . . . would result in emplacement of 1,522 cyd (2,979 tons) of asphalt; 22 tons per truck at [eight] miles per one-way trip for 2,160 miles of asphalt hauling trips. [¶] . . . Option 2 . . . would result in emplacement of 1,384 cyd (2,708 tons) of asphalt; 22 tons per truck at [eight] miles per one-way trip for 1,968 miles of asphalt hauling trips.

---

days for storm drain replacement, 15 working days for curb and gutter, 15 working days for asphalt and rock, and 25 working days for sidewalk.

". . . Sidewalks [¶] Option 1 . . . would result in 1,394 cyd of concrete emplacement; [eight] cyd per truck at [eight] miles per one-way trip for a total of 2,784 concrete hauling truck miles. [¶] . . . Option 2 . . . would result in 1,549 cyd of concrete emplacement; [eight] cyd per truck at [eight] miles per one-way trip for a total of 3,104 concrete hauling truck miles.

". . . [**Mariposa, Merced, and Kern**[20]] [¶] . . . Approximately 1,410 feet of length (0.27 mile) would be paved, [¶] . . . Approximately 2.6 acres would be disturbed during the . . . construction, [¶] . . . A maximum of 0.1 acre would be disturbed on any one day, [¶] . . . Project construction would begin in 2014,

". . . Demolition [¶] . . . Mariposa . . . demolition would result in 25,335 [cyd] (1,900 tons) of materials removed; 18 tons per truck at [eight] miles per one-way trip for a total of 1,696 materials hauling truck miles. [¶] . . . Kern and Merced . . . demolition would result in 47,004 [cyd] (3,525 tons) of materials removed; 18 tons per truck at [eight] miles per one-way trip for a total of 3,136 materials hauling truck miles.

". . . Soils Excavation [¶] . . . Mariposa . . . soils excavation would result in 1,239 . . . cyd . . . of materials; 16 cyd per truck at [eight] miles per one-way trip for a total of 1,232 soils hauling truck miles. [¶] . . . Kern and Merced . . . soils excavation would result in 991 . . . cyd . . . of materials; 16 cyd per truck at [eight] miles per one-way trip for a total of 992 soils hauling truck miles.

". . . Storm Drain replacement would result in 1,253 cyd of onsite materials movement with no export or import,

". . . Curb and Gutter would result in 141 cyd of soils removal, at [eight] cyd per truck and [eight] miles per one-way trip for a total of 144 on-road hauling miles, [¶] . . . [¶]

". . . Rock [¶] . . . Mariposa . . . would result in emplacement of 830 cyd (1,456 tons) of rock; 20 tons per truck at [eight] miles per one-way trip for 1,168 miles of rock hauling trips. [¶] . . . Kern and Merced . . . would result in emplacement of 664 cyd (1,166 [tons]) of rock; 20 tons per truck at [eight] miles per one-way trip for 944 miles of rock hauling trips.

". . . Asphalt [¶] . . . Mariposa . . . would result in emplacement of 421 cyd (824 tons) of asphalt; 22 tons per truck at [eight] miles per one-way trip for 592 miles of asphalt hauling trips. [¶] . . . Kern and Merced . . . would

---

[20] The parameters for Mariposa, Merced, and Kern applied to both Options 1 and 2.

result in emplacement of 337 cyd (660 tons) of asphalt; 22 tons per truck at [eight] miles per one-way trip for 480 miles of asphalt hauling trips.

"... Sidewalks would result in 918 cyd of concrete emplacement; [eight] cyd per truck at [eight] miles per one-way trip for a total of 1,840 concrete hauling truck miles.  [¶] ... [¶]

"*Results*  [¶]  The Project's construction emissions (equipment exhaust and dust generation) during construction are compared with the SJVAPCD's significance thresholds . . . .  [U]nmitigated emissions during construction do not exceed the daily or annual significance thresholds.[21]  [¶] . . . [¶]

"*Operational Pollutants*

"**Operational Carbon Monoxide Hotspots**  [¶]  [Option] 1 may be considered significant if a CO hot spot intersection analysis determines that CO concentrations generated either directly or indirectly by the [P]roject cause a localized violation of the State CO [one]-hour standard of 20 ppm [(parts per million)], State CO [eight]-hour standard of [nine] ppm, federal CO [one]-hour standard of 35 ppm, or federal CO [eight]-hour standard of [nine] ppm.

"Localized high levels of carbon monoxide (CO hot spot) are associated with traffic congestion and idling or slow moving vehicles.  To provide a worst-case scenario, CO concentrations are estimated at [P]roject-impacted intersections, where the concentrations would be the greatest.

"Using the CALINE4 model, potential CO hot spots were analyzed at the [Fresno Street/Van Ness Avenue and Ventura Avenue/H Street] intersections . . . .  The[se] intersections were chosen because they projected to operate at LOS[22] E or worse prior to any potential mitigation. There are several inputs to the CALINE4 model.  One input is the traffic volumes, which is from the [P]roject-specific traffic report.  The traffic volumes with the [P]roject, which includes [Option] 1, were used for the buildout scenario as well as emission factors generated using the EMFAC2007 model for the year 2015 and 2035.

---

**21**     The initial study provides a helpful table summarizing these findings.

**22**     "LOS" refers to level of service, a "qualitative description of traffic flow from the perspective of motorists."  There are six LOS levels (A, B, C, D, E, and F).  LOS A "represent[s] the least congested traffic conditions" while LOS F "represent[s] the most congested traffic conditions.  LOS D is considered "the acceptable level of traffic congestion on major streets" in Fresno.

19.

"... [T]he estimated [one]-hour and [eight]-hour average CO concentrations at [these] intersections ... are below the state and federal standards.[23]  Therefore, there are no CO hotspots anticipated from the reassigned [P]roject and cumulative traffic emissions.  [¶] ... [¶]

"Operational conditions under [Option] 1 would result in less than significant concentrations of carbon monoxide.

"**Mitigation Measures**

"Construction and operational emissions associated with the implementation of [Option] 1 would result in less than significant impacts to air quality in relation to criteria pollutants.  The following mitigation measures are recommended to ensure air emissions are minimized.

"*Construction Fugitive Dust*

"**MM AIR-1**[:]  During construction, in addition to [SJVAPCD] Regulation VIII requirements for dust control, the [P]roject shall also implement the following additional dust control measures:  [¶]  ... Limit traffic speeds on unpaved roads to 15 mph;  [¶]  ... Install sandbags or other erosion control measures to prevent slit runoff to public roadways from sites with a slope greater than one percent.  [¶]  ... Install wheel washers for all ex[]iting trucks, or wash off all trucks and equipment leaving the site;  [¶]  ... Install wind breaks at windward sides[] of construction areas; and  [¶]  ... Suspend excavation and grading activity when winds exceed 20 mph.  Regardless of wind speed, an owner/operator must comply with Regulation VIII's 20 percent opacity limitation.  [¶]  ... Post a publicly visible sign with the telephone number and person to contact at the lead agency regarding dust complaints.  This person shall respond and take corrective action within 48 hours.  [SJVAPCD]'s phone number shall also be visible to ensure compliance with applicable regulations.

"*Construction Equipment Exhaust*

"**MM AIR-2**[:]  During construction, the [P]roject shall also implement the following additional construction equipment exhaust control measures:  [¶] ... Idling times shall be minimized either by shutting equipment off when not in use or reducing the maximum idling time to [five] minutes (as required by the California airborne toxics control measure Title 13, Section

---

**23**     These estimates are (1) 3.0 ppm for one hour and 2.1 ppm for eight hours at Fresno Street and Van Ness Avenue; and (2) 2.8 ppm for one hour and 1.9 ppm for eight hours at Ventura Avenue and H Street.

20.

2485 of California Code of Regulations [CCR]).  Clear signage shall be provided for construction workers at all access points.  [¶]  . . . All construction equipment shall be maintained and properly tuned in accordance with manufacturer's specifications.  All equipment shall be checked by a certified visible emissions evaluator.  [¶]  . . . The [P]roject shall develop a plan demonstrating that the off-road equipment (more than 50 horsepower) to be used in the construction . . . (i.e., owned, leased, and subcontractor vehicles) would achieve a project wide fleet-average 20 percent $NO_x$ reduction and 45 percent $PM_{10}$ reduction compared to the most recent ARB fleet average.  Acceptable options for reducing emissions include the use of late model engines, low-emission diesel products, alternative fuels, engine retrofit technology, after-treatment products, add-on devices such as particulate filters, and/or other options as such become available.

"[*Option*] *2*  [¶]  **Less than significant impact.**  The determination of less than significant impact to air quality in relation to criteria pollutants as described above for [Option] 1 would be the same for [Option] 2. . . . Operational emissions for [Option] 2 would be the same as [Option] 1.  [¶] . . . [¶]

"*Results*  [¶]  The Project's construction emissions (equipment exhaust and dust generation) during construction are compared with the SJVAPCD's significance thresholds . . . .  [U]nmitigated emissions during construction do not exceed the daily or annual significance thresholds.  [¶] . . . [¶]

"**Mitigation Measures**

"Construction and operational emissions associated with the implementation of [Option] 2 would result in less than significant impacts to air quality in relation to criteria pollutants.  [MM AIR-1 and MM AIR-2] are recommended to ensure air emissions are minimized.  [¶] . . . [¶]

"**Cumulative Impacts**

"**Less than significant impact.**  Construction emissions associated with [Option] 1 or 2 could cumulatively combine with other emissions in the Air Basin.  However, the SJVAPCD has determined that a project-level exceedance of any of the criteria pollutant thresholds would have a significant cumulative impact on the air quality in the Air Basin by jeopardizing the Air Basin's attainment of state and federal standards.  If a project does not result in a project-level exceedance of any criteria pollutant threshold, the project would not result in a cumulatively considerable contribution to cumulative emissions within the Basin, and therefore, would

21.

have a less than significant cumulative impact.  Since [Options] 1 or 2 would not generate construction emissions that would exceed criteria pollutant thresholds, [Option] 1 or 2 would result in a contribution of air emissions that are considered less than cumulatively considerable.

"In addition, . . . operational CO concentrations at the Ventura [Avenue] and H Street intersection, which is considered an intersection representing potential worst-case CO concentrations under the Cumulative Plus Project Condition, would not exceed the state or federal CO standard.  Therefore, the implementation of [Option] 1 or 2 would result in less than significant cumulative impacts associated with CO concentrations.

"Overall, [Option] 1 or 2 would result in a less than significant cumulative air quality impact related to violating air quality standards or contributing substantially to an existing or projected air quality violation.

"**Criteria Pollutant**  [¶] . . . [¶]

"**Project Impacts**

"**[*Option*] *1*  [¶]  Less than significant impact.**  The evaluation of potential cumulatively considerable net increase of any criteria pollutant is addressed . . . above.  The evaluation . . . above determined that [Option] 1 would result in a less than significant cumulative impact on criteria pollutants.  Therefore, the determination . . . is less than significant cumulative impact on criteria pollutants.

"**[*Option*] *2*  [¶]  Less than significant impact.**  As described above, the determination of less than significant cumulative impacts on criteria pollutants under [Option] 2 is provided above . . . .

"**Cumulative Impacts**

"**Less than significant impact.**  As described above, the determination of less than significant cumulative impacts on criteria pollutants is provided above . . . .

"**Sensitive Receptors**  [¶] . . . [¶]

"Those who are sensitive to air pollution include children, the elderly, and persons with preexisting respiratory or cardiovascular illness.  A sensitive receptor is considered to be a location where a sensitive individual could remain for 24 hours, such as residences, hospitals, or convalescent facilities. . . .  [W]hen assessing the impact of pollutants with [one]-hour and [eight]-hour standards (such as carbon monoxide), commercial and/or

22.

industrial facilities would be considered sensitive receptors for those purposes.

"The nearest sensitive receptors are the existing residences that are located in the Hotel Californian, Pacific Southwest Building, and Masten Towers.

"There are three toxic air contaminants/hazardous air pollutants that are considered applicable to the [Project]. These pollutants include Mobile Source Air Toxics (MSAT), Naturally Occurring Asbestos (NOA), and Diesel Particulate Matter (DPM.)

"**Project Impacts**

"[*Option*] *1* [¶] **Less than significant impact.** Implementation of [Option] 1 would not expose sensitive receptors to substantial concentrations of MSAT, NOA, or DPM . . . .

"*Mobile Source Air Toxics* [¶] The 2009 Interim Guidance Update on Mobile Source Air Toxic Analysis . . . , published by the Federal Highway Administration (FHWA), was utilized to determine the [P]roject's potential for MSAT impacts. The FHWA has developed a tiered approach for analyzing MSAT, which are based on three levels of analysis: [¶] 1. No analysis for projects with no potential for meaningful MSAT effects; [¶] 2. Qualitative analysis for projects with low potential MSAT effects; or [¶] 3. Quantitative analysis to differentiate alternatives for projects with higher potential for MSAT effects. [¶] Under the first level, projects with no potential for meaningful MSAT effects, the types of projects included are . . . [¶] . . . [¶] . . . [p]rojects with no meaningful impacts on traffic volumes or vehicle mix.

"Analysis shows that the implementation of [Option] 1 would have no meaningful impacts on traffic volumes or vehicle mix for the [P]roject area . . . . However, [Option] 1 would reassign existing trips in the [P]roject area. [Option] 1 does not propose any additional traffic generating land uses. Since [Option] 1 includes two-way vehicular streets, it is anticipated that the reintroduced roadways associated with this [option] would serve existing traffic by providing access to existing businesses within [the] Mall, but would not induce additional travel upon opening as described in the [P]roject traffic report . . . . Based on a review of the [P]roject traffic report, except for Fulton . . . , [Option] 1 would slightly increase average daily traffic on seven of the 15 roadway segments that were evaluated. The maximum increase would be 72 average daily trips (ADT) compared to the baseline conditions and 410 ADT under cumulative plus project conditions compared to cumulative no project conditions. Fulton . . . between Inyo . . .

23.

and Tuolumne . . . would experience 210 [ADT] under baseline plus project conditions and 2,310 ADT under cumulative plus project conditions.

"The apparent increase is not a trip increase from [Option] 1, but is a result of reassignment of existing trips through the [P]roject area. All trips would be existing in the [P]roject area under [Option] 1. Existing trips within the [P]roject area would be rerouted from existing travel paths through the [P]roject segments.

"[Option] 1 would not increase the number of trips on the [P]roject area roadways compared to baseline conditions. However, [Option] 1 would reassign existing trips to a new location, the . . . Mall. The relocation of existing trips may have a low potential for MSAT emissions.

"A qualitative analysis provides a basis for identifying MSAT emissions. The qualitative assessment presented below is derived in part from a study conducted by the FHWA entitled *A Methodology for Evaluating Mobile Source Air Toxic Emissions Among Transportation Project Alternatives* . . . . [¶] . . . [¶]

"The amount of MSAT emitted under [Option] 1 would be proportional to the vehicle miles traveled, or VMT. The VMT estimated for [Option] 1 is the same as for the baseline condition and the cumulative no project condition[;] however, [Option] 1 increases the efficiency of the roadway and attracts rerouted trips from elsewhere in the transportation network. This relocation of VMT would lead to higher MSAT emissions for [Option] 1 along the [Project] alignment, along with a corresponding decrease in MSAT emissions along the parallel routes. The emissions increase is offset somewhat by lower MSAT emission rates due to increased speeds . . . according to EPA's MOVES2010b model . . . . Emissions will likely be lower than present levels in the design year as a result of EPA's national control programs that are projected to reduce annual MSAT emissions by over 80 percent between 2010 and 2050. Local conditions may differ from these national projections in terms of fleet mix and turnover, VMT growth rates, and local control measures. However, the magnitude of the EPA-projected reductions is so great (even after accounting for VMT growth) that MSAT emissions in the study area are likely to be lower in the future in nearly all cases.

"The reintroduced travel lanes contemplated as part of [Option] 1 will have the effect of moving some traffic closer to nearby residences; therefore, there may be localized areas where ambient concentrations of MSAT could be higher compared to the no build [options]. The localized increases in MSAT concentrations would likely be most pronounced along the

24.

expanded roadway sections that would be built at [the] Mall.  However, the magnitude and the duration of these potential increases compared to the baseline or cumulative no project conditions cannot be reliably quantified due to incomplete or unavailable information in forecasting project-specific MSAT health impacts.  In sum, when a roadway is reintroduced, the localized level of MSAT emissions for [Option] 1 could be higher relative to the no build condition, but this could be offset due to increases in speeds and reductions in congestion in the [P]roject area (which are associated with lower MSAT emissions).  Also, MSAT will be lower in other locations when traffic shifts away from them.  However, on a regional basis, EPA's vehicle and fuel regulations, coupled with fleet turnover, will over time cause substantial reductions that, in almost all cases, will cause region-wide MSAT levels to be significantly lower than today.

"Furthermore, analysis shows [Option] 1 would generate minimal air quality impacts for the Clean Air Act criteria pollutants . . . and has not been linked with any special MSAT concerns.

"Moreover, EPA regulations for the vehicle engines and fuels will cause overall MSAT emissions to decline significantly over the next several decades.  Based on regulations now in effect, an analysis of national trends with EPA's MOBILE6.2 model forecasts a combined reduction of 72 percent in the total annual emission rate for the priority MSAT from 1999 to 2050 while vehicle miles of travel are projected to increase by 145 percent.  This will both reduce the background levels of MSAT as well as the possibility of even minor MSAT emissions from this [P]roject.

"Overall, the implementation of [Option] 1 would create less than significant impacts related to MSAT emissions.

"*Naturally Occurring Asbestos*  [¶]  During construction in areas that contain naturally occurring asbestos (NOA)-containing rock formations, asbestos can be released into the air and pose a health hazard.  The Department of Conservation, Division of Mines and Geology (DMG) has a published guide for generally identifying areas that are likely to contain NOA . . . .  A review of DMG's map showing areas more likely to have rock formations containing NOA indicates that the . . . Mall site is not in an area that is likely to contain NOA.  In addition, the DMG map indicates that there are no areas within City . . . likely to contain NOA.  Therefore, disturbance of NOA is not a concern for the implementation of [Option] 1.

"*Diesel Particulate Matter*  [¶]  Construction activities would also involve the use of diesel-powered construction equipment, which emit DPM.  Risk assessments for residential areas exposed to toxic air contaminants (TACs)

25.

such as DPM are generally based on a 70-year period of exposure. Construction emissions would occur in 2014 and 2015, and construction is anticipated to be completed within 12 months. Since the use of construction equipment would be temporary and would not be close to the 70-year timeframe, exposure of sensitive receptors to TACs would not be substantial. Emissions of DPM would not be substantial enough to be considered a health risk.

"[*Option*] *2* [¶] **Less than significant impact.** The determination of less than significant impacts on sensitive receptors as described above for [Option] 1 would be the same for [Option] 2.

"**Cumulative Impacts** [¶] **Less than significant impact.** The implementation of [Option] 1 or 2, which proposed the addition of roadway segments, will redistribute [ADT]. This redistribution will result in a minor increase in traffic volumes along certain roadway segments and decreases along other roadway segments. As described above . . . , the [Project] would result in less than significant impacts on sensitive receptors. In addition, the [P]roject's contribution to potential cumulative impacts would be less than cumulatively considerable. Therefore, the implementation of [Option] 1 or 2 would result in a less than significant cumulative impact.

"**Odors** [¶] . . . [¶]

"Two situations create a potential for odor impact. The first occurs when a new odor source is located near an existing sensitive receptor. The second occurs when a new sensitive receptor locates near an existing source of odor. . . . [¶] . . . [¶]

"**Project Impacts**

"[*Option*] *1* [¶] **Less than significant impact.** The development of [Option] 1 would allow the addition of roadways within [the] Mall. The addition of roadways [is] not considered a source of objectionable odors according to the [SJVAPCD]. . . . During [P]roject operations, the [P]roject could produce odors as a result of increased vehicles within [the] Mall; however, the anticipated increase in vehicles is not expected to be substantial as addressed . . . above. Therefore, a potential increase in odors from vehicular traffic would be less than significant.

"During construction, onsite diesel powered equipment and vehicles will emit diesel particular matter, which is odorous to some. Also during construction, there would be short-term emissions of ROGs during asphalt paving. These odors will dissipate with distance and should not reach an

26.

objectionable level at nearby residences. Impacts would be less than significant.

"[*Option*] *2* [¶] **Less than significant impact.** The determination of a less than significant odor impact as described above under [Option] 1 would be the same for [Option] 2.

"**Cumulative Impacts**

"**Less than significant impact.** The implementation of [Options] 1 or 2 would not add a source of objectionable odors. Therefore, the contribution of [Options] 1 or 2 to potential significant cumulative odor impacts would be less than cumulatively considerable, and thus less than cumulatively significant. [¶] . . . [¶]

"**3.7 – Greenhouse Gas Emissions** [¶] . . . [¶]

"**Greenhouse Gas Emissions** [¶] . . . [¶]

"**Project Impacts**

"[*Option*] *1* [¶] **Less than significant impact.** An individual project does not generate enough greenhouse gas emissions to significantly influence global climate change. Rather, global climate change is a cumulative impact. This means that a project may participate in a potential impact through its incremental contribution combined with the contributions of all other sources of greenhouse gases. In assessing cumulative impacts, it must be determined if a project's incremental effect is 'cumulatively considerable.' See CEQA Guidelines sections 15064(h)(1) and 15130. To make this determination the incremental impacts of the project must be compared with the effects of past, current, and probable future projects. To gather sufficient information on a global scale of all past, current, and future projects in order to make this determination is a difficult if not impossible task. [¶] . . . [¶]

"*Generate Greenhouse Gas Emissions*

"Greenhouse gas emissions for transportation projects can be divided into those produced during construction and those produced during operations. Construction greenhouse gas emissions include emissions produced as a result of material processing, emissions produced by onsite construction equipment, and emissions arising from traffic delays due to construction. These emissions will be produced at different levels throughout the construction phase; their frequency and occurrence can be reduced through

27.

innovations in plans and specifications and by implementing better traffic management during construction phases.

"*Construction*

"[Option] 1 would emit greenhouse gases from upstream emission sources and direct sources (combustion of fuels from worker vehicles and construction equipment). An upstream emission source (also known as life cycle emissions) refers to emissions that were generated during the manufacture of products to be used for construction of the Project. Upstream emission sources for [Option] 1 include but are not limited to the following: emissions from the manufacture of steel and/or emissions from the transportation of construction materials in other countries. The upstream emissions were not estimated because they are not within the control of [Option] 1 and to do so would be speculative at this time. Additionally, the California Air Pollution Control Officers Association (CAPCOA) White Paper on CEQA & Climate Change supports this conclusion by stating, 'The full life-cycle of GHG [greenhouse gas] emissions from construction activities is not accounted for . . . and the information needed to characterize [life-cycle emissions] would be speculative at the CEQA analysis level' (CAPCOA 2008). Therefore, pursuant to CEQA Guidelines Section 15144 and 15145, upstream/life cycle, emissions are speculative and no further discussion is necessary.

"The emissions of $CO_2$ from [Option] 1 construction equipment and worker vehicles were calculated using the Road Construction Emissions Model, Version 7, and the CalEEMod emissions model. . . . [Option] 1 would result in approximately 910.62 metric tons of $CO_2$ ($MTCO_2e$) in 2014. [Option] 1 would also emit methane and nitrous oxide from construction equipment; however, emissions of methane and nitrous oxide are negligible compared to $CO_2$ emissions.

"Construction emissions would be short term in nature and would occur before the year 2020. AB 32[24] requires that annual emissions in the State of California be reduced to 1990 levels by the year 2020. Although some greenhouse gases can remain in the atmosphere for long periods, AB 32 does not regulate concentrations.

---

**24** "AB 32" refers to California's Global Warming Solutions Act of 2006.

"*Operation*

"Greenhouse gas emissions were estimated using the web-based data access EMFAC2011 . . . . The proposed Fulton . . . between Tuolumne . . . and Inyo . . . would result in 210 average annual daily trips (AADT) under baseline plus project condition and 2,310 AADT under cumulative with project condition. . . . [T]he [P]roject does not propose any additional traffic generating land uses and would only redistribute trips. Therefore, development under [Option] 1 would not result in any additional vehicle miles traveled compared to the no project scenario.

"Since [Option] 1 would not result in any additional vehicle miles traveled, emissions estimates . . . are the same for all [options]. However, [Option] 1 is expected to improve the LOS at intersections within the vicinity of [the] Mall. [Option] 1 would create additional travel pathways through the [P]roject area, and provide more direct routes through the [P]roject area, thereby improving mobility and potentially reducing regional VMT. Improvement in traffic flow would reduce criteria pollutants and greenhouse gas emissions because emissions on a grams-per-mile basis decrease while the speed increases, with a peak efficiency at about 45 to 50 miles per hour. Therefore, emissions of greenhouse gases would be lower with . . . [Option] 1 and higher with the no project alternative.

". . . The highest levels of carbon dioxide from mobile sources, such as automobiles, occur at stop-and-go speeds (0-25 miles per hour) and speeds over 55 mph; the most severe emissions occur from 0-25 miles per hour. To the extent that a project relieves congestion by enhancing operations and improving travel times in high congestion travel corridors greenhouse gas emissions, particularly $CO_2$, may be reduced.

"In summary, the implementation of [Option] 1 is considered to result in a less than significant impact on greenhouse gas emissions from construction and operation activities[.]

"[*Option*] *2* [¶] **Less than significant impact.** The determination of less than significant impacts on greenhouse gases as described above under [Option] 1 would be the same as described for [Option] 2. The specific amount of construction-related greenhouse gas emissions is slightly lower (909.53 $MTCO_2e$ in 2014) for [Option] 2 compared to [Option] 1.

"**Cumulative Impacts**

"**Less than significant impact.** Cumulative development in Downtown Fresno will result in the generation of greenhouse gases during construction

29.

and operational activities. Implementation of [Option] 1 or 2 would result in the generation of greenhouse gas emissions during construction, but is expected to reduce greenhouse gases during operation of the [P]roject by relieving congestion through enhanced operations and improving travel times. The contribution of greenhouse gases during construction activities under [Option] 1 or 2 would contribute to cumulative greenhouse gas emissions; however, this contribution would be less than cumulatively considerable because the emissions would not be ongoing and would occur over a short duration. Therefore, [Option] 1 or 2 would result in less than significant cumulative impacts on greenhouse gases.

"**Conflict with Plan, Policy, or Regulation that Reduces Emissions** [¶] . . . [¶]

"**Project Impacts**

"[*Option*] *1* [¶] **No impact.** As described above . . . , [Option] 1 would likely reduce the future-year greenhouse gas emissions generated by trips through the [P]roject area. Therefore, [Option] 1 would also lower fuel consumption associated with travel in the area. Implementation of [Option] 1 would not conflict with any applicable greenhouse gas plan, and therefore, [Option] 1 would result in no impact on an applicable plan.

"[*Option*] *2* [¶] **No impact.** The determination of no impact on an applicable greenhouse gas plan as described above for [Option] 1 would be the same for [Option] 2.

"**Cumulative Impacts** [¶] **No impact.** Since [Option] 1 or 2 would not conflict with an applicable greenhouse gas plan, neither [Option] 1 or 2 would contribute to cumulative impacts on an applicable plan. Therefore, [Option] 1 or 2 would result in no cumulative impacts on an applicable greenhouse gas plan. [¶] . . . [¶]

"**3.14 – Public Services** [¶] . . . [¶]

"**Parks** [¶] . . . [¶]

"**Project Impacts**

"[*Option*] *1* [¶] **No impact.** The [P]roject does not include new parks or alterations to existing facilities. Reintroducing roadways in place of the . . . Mall would not require new park facilities to be provided or require directly altering existing government facilities because the introduction of new roadways would not directly affect service ratios or performance objectives

related to parks. Therefore, [P]roject implementation would not result in impacts related to the parks.

"[*Option*] *2* [¶] **No impact.** The determination of no impacts to parks described for [Option] 1 would be the same for [Option] 2.

"**Cumulative Impacts** [¶] **No impact.** The [P]roject does not include new parks or alterations to existing facilities. Reintroducing roadways in place of the . . . Mall would not require new park facilities to be provided or require direct[ly] altering existing governmental facilities because the introduction of new roadways would not directly affect service ratios or performance objectives related to parks. Therefore, [P]roject implementation would not result in cumulatively considerable impacts. [¶] . . . [¶]

"**3.15 – Recreation**

"**Increase Use of Parks and Recreational Facilities Physical Effect on Environment** [¶] . . . [¶]

"The City . . . currently has a mix of regional, community, neighborhood, pocket, and mini parks within the city limits. A limited number of parks are provided in the downtown area. No parks are located within the immediate vicinity of [the] Mall. There are two recreational areas for children within [the] Mall. These areas are tot lots with playground equipment and sand areas. One of the tot lots is located within [the] Mall immediately north of Kern . . . and encompasses 966 square feet of active play equipment area. The second tot lot is also within [the] Mall immediately south of Merced . . . and encompasses 806 square feet of active play equipment area. Today most, though not all, of this equipment remains functional for the children to use.

"**Project Impacts**

"[*Option*] *1* [¶] **Less than significant impact.** The implementation of . . . [Option] 1 for the proposed . . . [P]roject will result in direct effects to the existing tot lots that are used for public recreation. The two tot lots encompass approximately 1,772 square feet of active play equipment area. [Option] 1 would result in the relocation of the tot lots and they will be consolidated into one larger tot lot within the Project Study Area at the Fresno County Economic Opportunities Commission campus near the intersection of Mariposa and Congo Alley. During the construction period, the removal of this resource would create a temporary adverse effect. The provision of an equal square footage of active play space within the Project

31.

Study Area will reduce the long-term effect so that the effect is not adverse. The long-term restoration or replacement of the playground equipment will provide a beneficial recreational effect because all equipment will be functional for the children to use.

"[*Option*] *2* [¶] **Less than significant impact.**  The determination of less than significant impacts to other recreational facilities under [Option] 2 would be the same as described above for [Option] 1.

"**Cumulative Impacts** [¶] **Less than significant impact.**  The provision of an equal square footage of active play space within the Project Study Area will reduce the long-term effect so that the effect is not adverse.  The long-term restoration or replacement of the playground equipment will provide a beneficial recreational effect because all equipment will be functional for the children to use.  Therefore, the [P]roject would be less than cumulatively considerable.

"**3.16 – Transportation and Traffic**

"**Traffic Increase** [¶] . . . [¶]

"**Study Area**[25] [¶]  The selected Study Area was determined through consultation with City . . . and Caltrans[26] District 6 staff, the 'City of Fresno Traffic Impact Study Report Guidelines' . . . , and the transportation impact analysis conducted for the . . . DNCP . . . and . . . FCSP. . . . [¶] . . . [¶]

"**Project Impacts**

"[*Option*] *1* [¶] **Less than significant impact.**  [Option] 1 includes the addition of two-lane, two-way streets within [the] Mall.  This [Option] does not propose any additional traffic generating land uses.  With the addition

---

**25**     The initial study evaluated the following intersections:  (1) Stanislaus Street and Van Ness Avenue; (2) Stanislaus Street and Fulton Street; (3) Stanislaus Street and Broadway; (4) Tuolumne Street and Broadway; (5) Tuolumne Street and Fulton Street; (6) Tuolumne Street and Van Ness Avenue; (7) Fresno Street and H Street; (8) Fresno Street and Fulton Street; (9) Fresno Street and Van Ness Avenue; (10) Tulare Street and H Street; (11) Tulare Street and Fulton Street; (12) Tulare Street and Van Ness Avenue; (13) Inyo Street and H Street; (14) Inyo Street and Fulton Street; (15) Inyo Street and Van Ness Avenue; (16) Ventura Avenue and H Street; (17) Ventura Avenue and Broadway; and (18) Ventura Avenue and Van Ness Avenue.

**26**     "Caltrans" refers to the California Department of Transportation.

of new streets, [Option] 1 would cause some shifts in local traffic patterns. To evaluate this shift in traffic patterns, a locally validated version of the 2010 Fresno COG TDF[27] model was used to estimate the re-distribution of traffic in the study area.  The Fresno COG TDF model confirmed that opening [the] Mall to vehicular traffic would not affect traffic volumes outside the study area.  The model also confirmed that opening the [M]all to vehicular traffic resulted in minor changes to traffic patterns, primarily on Fulton . . . and parallel facilities, such as Van Ness Avenue.

"A baseline plus project condition was evaluated for the AM and PM peak hour at the study area intersections.  The project condition was opening the Mall to traffic. . . .  [T]he AM and PM peak hours would continue to operate at LOS D or better during the baseline plus project condition. Therefore, the implementation of [Option] 1 would result in a less than significant impact on traffic conditions.

"[*Option*] *2*  [¶]  **Less than significant impact.**  The determination of less than significant impact on traffic conditions under [Option] 2 would be the same as described for [Option] 1.

"**Cumulative Impacts  [¶]  Less than significant impact with mitigation measures incorporated.**  Under Cumulative Conditions, the traffic evaluation uses local and regional planning and funding documents to identify the reasonably foreseeable changes to the transportation system and development patterns in the Fresno region.  The cumulative analysis includes the future implementation of the DNCP and FCSP by the year 2035.  In addition to the DNCP and FCSP, the cumulative projects include[] a financially constrained list of transportation projects for which funding has been identified or is reasonably expected to be available within the RTP planning horizon of 2035.  All of these projects are included in the 2035 Fresno COG TDF model used in this cumulative conditions analysis. The Cumulative No Project conditions analysis reflects anticipated conditions without the proposed . . . Project.  This includes the cumulative transportation and land use development changes identified above, including projected development within the project area consistent with the DNCP and FCSP.

"A cumulative no project condition was evaluated for the AM and PM peak hour at the study area intersections.  The traffic report and analysis described that were five intersections that would operate at LOS E or F during the AM and/or PM peak hour under the Cumulative No Project

---

27      "TDF" means "travel demand forecasting."

33.

condition.  These five intersections include the following:  [¶]  1. Stanislaus Street/Broadway Street  [¶]  2. Tuolumne Street/Broadway Street  [¶] 3. Fresno Street/H Street  [¶]  4. Fresno Street/Van Ness Avenue  [¶] 5. Ventura Avenue/H Street[.]

"A Cumulative Plus Project . . . Conditions was evaluated for the AM and PM peak hour at the study area intersections.  Given there would be intersections that would not operate at an acceptable level of service under the Cumulative No Project Condition, the . . . Traffic Impact Study Report Guidelines were reviewed to determine the significance criteria for projects with intersections not operating [at] acceptable levels prior to adding a proposed project.  According to the . . . Traffic Impact Study Report Guidelines, a significant impact would occur if the project increases the average delay for a study intersection that is already operating at an unacceptable level.  Based on the evaluation in the . . . Mall Supplemental Traffic Analysis – 2025 General Plan, there would be four intersections that would operate at an unacceptable level of service during the AM and/or PM peak hour under the Cumulative Plus Project Conditions. . . .

"***Stanislaus Street/Broadway Street***  [¶]  The technical calculations show that the overall intersection delay at this intersection decreases slightly from 165 seconds to 159 seconds during the PM peak hour with the proposed [P]roject.  Therefore, the [P]roject would not have a cumulatively significant impact at this location.

"***Tuolumne Street/Broadway Street***  [¶]  The technical calculations show that the overall intersection delay at this intersection increases from 541 seconds to 723 seconds during the PM peak hour with the proposed [P]roject.  Therefore, the [P]roject would have a potentially significant impact at this location.

"***Fresno Street/H Street***  [¶]  At this intersection, the traffic delay would decrease with the proposed [P]roject during the AM and PM peak hours. Therefore, the [P]roject would not have a cumulatively significant impact at this location[.]

"***Ventura Avenue/H Street***  [¶]  The Cumulative No Project and Cumulative Plus Project traffic volumes at this intersection indicate that the proposed [P]roject is not expected to result in a substantial change in traffic at this location.  In the AM peak hour, two turning movements have a minor increase in traffic volumes that can be attributed to rounding and model variation.  In the PM peak hour, one turning movement has a minor increase while one has a minor decrease that can also be attributable to rounding and model variation.  In the AM peak hour, the change in traffic

34.

volumes through the intersection is an increase of less than one percent, which is well within observed variation in day-to-day traffic. Therefore, this change is not considered cumulatively significant. In the PM peak hour, there is no net change in traffic volumes through the intersection. Similarly, this change is not considered cumulatively significant.

"To reduce the [P]roject's contribution to a potential significant traffic impact at the Tuolumne Street/Broadway Street intersection, the following mitigation measure is required.

"**MM TR-1**[:] Prior to the Tuolumne Street/Broadway Street intersection degrading to worse than LOS D, the City . . . shall modify the existing signal to allow the split phase operations on northbound and southbound Broadway Street. If the City . . . adopts a revision to the current LOS standard of LOS D and allows LOS F for Downtown Fresno intersections prior to the intersection degrading to worse than LOS D, then the recommended improvement would not be required.

"The implementation of the recommended improvement would reduce the delay at the Tuolumne Street/Broadway Street intersection to 33 seconds, and the intersection would operate at LOS C that complies with the City's current LOS standard. Therefore, the proposed [P]roject's contribution to a potential cumulative impact is less than cumulatively considerable, thus less than cumulatively significant. [¶] . . . [¶]

"**3.17 – Utilities and Service Systems**

"A technical report on utilities in the Downtown Fresno area was prepared. This report is [the] Fulton Corridor Specific Plan and Community Plan EIR Technical Report prepared . . . in February 2013 . . . . In addition, memorandum letters were prepared by the City . . . to supplement the information in the Report identified above. These memorandum letters include 'Water Supply and Delivery Infrastructure Within The Downtown Plans Area' . . . and 'Response to Questions Related to DNCP and FCSP Environmental Studies' . . . . The following information was obtained from the Report and memorandum letters.

"The utilities in the . . . Mall vicinity include water, sewer, drainage, natural gas, electricity, and telecommunication systems (i.e., cable and telephone). The water, sewer, and drainage facilities are owned by the City . . . while the natural gas and electricity is owned by Pacific, Gas & Electric, and telecommunications systems in the . . . Mall Project Study Area are not known.

35.

"Water distribution and transmission facilities are currently located within Federal Alley east of [the] Mall and within Home Run Alley and Congo Alley west of [the] Mall, respectively, between Inyo . . . and Tuolumne . . . . These facilities range from [six]-inch to 12-inches in diameter. Additional water distribution lines also ranging in diameter from [six]-inch to 12-inches are located within Inyo . . . , Kern . . . , Tulare . . . , Mariposa . . . , Fresno . . . , and Tuolumne . . . . Each of the existing water distribution and transmission facilities identified above are currently adequate to serve the existing uses . . . .

"Public and private sewer distribution facilities are located within the . . . Mall vicinity. Public sewer facilities include up to 30-inch lines within Merced . . . between Van Ness Avenue and H Street, Kern . . . from Van Ness Avenue to Home Run Alley, and Home Run Alley between Kern . . . and Inyo . . . . Private sewer lines are located within Federal Alley, Home Run Alley, and Congo Alley except for the portion of Home Run Alley south of Kern . . . . Each of the existing sewer facilities identified above is currently adequate to serve the existing uses. No sewer lift stations are located within the rights-of-way of [the] Mall . . . . The sewer facilities, while adequately sized to serve existing uses, are of very advanced age and in poor condition. The City['s] . . . Department of Public Utilities has plans to rebuild these facilities with local funds. The sewer replacement project is anticipated to occur simultaneously with the implementation of the . . . Project.

"Storm drain facilities are located within the . . . Mall vicinity. A storm drain is located under [the] Mall between Inyo . . . and Tuolumne . . . . Addition[al] storm drains are located within Merced . . . between Van Ness [Avenue] and H Street, Fresno . . . between Van Ness [Avenue] and H Street, Mariposa . . . between the Federal Alley and H Street, Tulare . . . between Home Run Alley and H Street, Kern . . . between Home Run Alley and Federal Alley, and along Home Run Alley between Kern . . . and Tulare . . . . Each of the existing drainage distribution facilities identified above is currently adequate to serve the existing uses . . . .

"Natural gas, electricity, and telecommunication systems are located in the . . . Mall vicinity. The specific locations of these facilities are not known at this time; however, it is known that some of these facilities are located within [the] Mall.

"**Wastewater Treatment** [¶] . . . [¶]

"As a condition of a Clean Water Grant issued by the Federal government, the City . . . was designated the Regional Sewer Agency for the Fresno-

Clovis Metropolitan Area (FCMA) in 1966.  The City operates the Regional Wastewater Reclamation Facility (RWRF) under a Joint Powers Agreement with Clovis and the County of Fresno.  The 3,000-acre[]RWRF was originally constructed in 1947, and is located inside the City limits but within a non-contiguous area situated approximately 3.5 miles southwest of the Chandler Executive Airport.  Over the past 40 years, the RWRF has been expanded and rehabilitated several times, most recently in 2010 when process units were added to the facility to address high organic concentrations within incoming wastewater.  The treatment plant includes a number of redundant facilities that allow for regular maintenance and provide backup capacity in the event of equipment failure.  The RWRF currently provides secondary treatment and has a rated capacity of 80 million gallons per day, with equipment redundancy to accommodate maintenance schedules or equipment failures.  Effluent disposal occurs primarily through a combination of infiltration beds located at the RWRF and agricultural irrigation . . . .  [C]urrent treatment at RWRF is less than 75 percent of the current capacity.

"**Project Impacts**

"[*Option*] *1*  [¶]  **No impact.**  Under this [option], no wastewater would be directly generated, and there would be no direct impacts on wastewater treatment capacity or wastewater treatment requirements.  Based on information in the Fulton Mall Urban Decay Study . . . , the reopening of Fulton . . . and adding on-street parking under [Option] 1 would induce growth through the reoccupation of existing office and retail vacant space within the vicinity of [the] Mall through the year 2035.  According to CEQA Guidelines Section 15126.2(d), '[i]t must not be assumed that growth in any area is necessarily beneficial, detrimental, or of little significance to the environment.'  The anticipated growth inducement and its potential effects are addressed as part of cumulative impacts because the future growth that would occur from the reoccupation of existing office and retail vacant space is considered to occur as part of future projects. . . .

"[*Option*] *2*  [¶]  **No impact.**  The determination of no impact on wastewater treatment capacity or wastewater treatment requirements as discussed above for [Option] 1 would be the same for [Option] 2.  In addition, [Option] 2 would also result in a similar inducement of growth through the reoccupation of existing vacant office and retail space. . . .

"**Cumulative Impacts**  [¶]  **No impact.**  Implementation of cumulative development will result in increases in the generation of wastewater in Downtown Fresno.  Part of this cumulative increase is the projected increase from the reoccupation of existing office and retail vacant space in

37.

the vicinity of [the] Mall as well as throughout Downtown Fresno. With cumulative development through 2035 throughout Downtown Fresno, a greater amount of vacant office and retail space is projected to be reoccupied within the vicinity of [the] Mall with the implementation of [Option] 1 or 2 compared to without the implementation of [Option] 1 or 2. This potential increase in the reoccupation of vacant office and retail space would be part of future growth and the implementation of future cumulative projects throughout the City. The anticipated increase in the reoccupation with [Option] 1 in the year 2035 would be approximately 188,254 square feet of office use and approximately 80,000 square feet of retail use more than without the addition of streets and parking within [the] Mall. The anticipated increase in the reoccupation with [Option] 2 in the year 2035 would be approximately 188,254 square feet of office and approximately 51,300 square feet of retail use more than without the addition of streets and parking within [the] Mall.

"Cumulative development within the City through the year 2035 is anticipated to generate more wastewater than the current capacity of the existing RWRF . . . . [C]umulative growth through 2035 is anticipated to generate approximately 87 million gallons per day (mgd) which is greater than the current treatment capacity of 80 mgd. Since treatment capacities are projected to be greater than the current treatment capacity, cumulative development throughout the City through 2035 could result in the exceedance of wastewater treatment requirements.

"Part of the future cumulative increase in wastewater generation includes the wastewater generation from cumulative growth that is anticipated to be induced by the development of [Option] 1 or 2. As stated above, [Option] 1 would result in the inducement of the reoccupation of approximately 188,254 square feet of office use and approximately 80,000 square feet of retail use. The potential reoccupation of space under [Option] 1 would increase existing wastewater flows to the RWRF. For the purpose of this evaluation, wastewater flows from the reoccupation of currently vacant space is based on a worst-case assumption that employees generate the same amount of wastewater as residents. Under this assumption, a wastewater generation factor of 110 gallons per capita per day was used for employees . . . . Employees for an office use and retail use are based on a national average employment density for office uses of 291 square feet per employee and based on 400 square feet per person for retail employment. . . . Based on the employment densities and the cumulative growth from reoccupying vacant space, the increase in office use would generate approximately 647 employees and the increase in retail use would generate approximately 200 employees for a total of 847 employees.

Therefore, based on the additional 847 employees at a wastewater generation factor of 110 gallons per capita per day, there would be approximately 0.093 mgd generated.  This increase in wastewater generation from the portion of cumulative growth that would be induced as a result of implementing [Option] 1 would contribute to the cumulative exceedance of the current wastewater treatment capacity and could result in the cumulative exceedance of wastewater treatment requirements.  Since [Option] 2 would result in a slightly less inducement of the reoccupation of vacant office and retail space, the portion of cumulative growth associated with [Option] 2 would result in less generation of wastewater compared to [Option] 1; however, wastewater generation from the induce[d] growth associated with [Option] 2 would still contribute to significant cumulative impacts on the existing treatment capacity at RWRF and could result in the cumulative exceedance of wastewater treatment requirements.  Growth that will occur from the reoccupation of existing vacant space and from new developments will be associated with future cumulative projects.  The implementation of these cumulative projects are anticipated to result in significant cumulative impacts on the current wastewater treatment capacity and could result in significant cumulative impacts associated with wastewater treatment requirements of the Regional Water Quality Control Board (RWQCB).

"Although cumulative impacts may be significant, the implementation of [Option] 1 or 2 would not directly generate wastewater, and therefore, [Option] 1 or 2 would not contribute to the potential significant cumulative impacts projected with the implementation of future growth anticipated through the year 2035.  Therefore, the implementation of [Option] 1 or 2 would result in no cumulative impacts to existing wastewater treatment capacities or potential exceedances of wastewater treatment requirements regulated by the RWQCB.

"**Water or Wastewater Treatment Facilities**  [¶] . . . [¶]

"**Project Impacts**

"[*Option*] *1*  [¶]  **No impact.**  Under this [option], no wastewater would be directly generated.  Therefore, the implementation of [Option] 1 would result in no impacts on existing wastewater treatment facilities.  [¶] . . . [¶]

"This [option] would result in the demand for water supplies for irrigating the proposed landscaping as well as maintaining fountains.  However, this demand for irrigation and maintenance is expected to be less than the current demand because there will be fewer fountains to maintain.  The number of trees to irrigate under [Option] 1 is the same number as the

39.

existing trees.  Due to a reduction in water requirements under [Option] 1 compared to existing conditions, the existing water lines that are located in and adjacent to [the] Mall will be adequate to convey water to the proposed landscaping and fountains.  No new water lines will be required as part of [Option] 1.  Therefore, [Option] 1 would result in no impacts to existing water facilities.  [¶] . . . [¶]

"[*Option*] *2*  [¶]  **No impact.**  The determination of no impact as discussed for [Option] 1 is the same for [Option] 2.

"**Cumulative Impacts**  [¶]  **No impact. . . .**  [Option] 1 or 2 would result in no cumulative impacts on wastewater facilities.

"Implementation of cumulative development will result in increases in the demand for water in Downtown Fresno.  Part of this cumulative increase is the projected increase from the reoccupation of existing office and retail vacant space in the vicinity of [the] Mall as well as throughout Downtown Fresno.  With cumulative development through 2035 throughout Downtown Fresno, a greater amount of vacant office and retail space is projected to be reoccupied within the vicinity of [the] Mall with the implementation of [Option] 1 or 2 compared to without the implementation of [Option] 1 or 2.  This potential increase in the reoccupation of vacant office and retail space would be part of future growth and the implementation of future cumulative projects throughout Downtown Fresno.  The anticipated increase in the reoccupation with [Option] 1 in the year 2035 would be approximately 188,254 square feet of office use and approximately 80,000 square feet of retail use more than without the addition of streets and parking within [the] Mall.  The anticipated increase in the reoccupation with [Option] 2 in the year 2035 would be approximately 188,254 square feet of office and approximately 51,300 square feet of retail use more than without the addition of streets and parking within [the] Mall.

". . .  [C]umulative development in Downtown Fresno could result in a significant impact on existing water facilities. . . .  [A] new [three-]million gallon water storage tank and a new regional transmission main would be required to serve future development in Downtown Fresno.  In addition, cumulative development in Downtown Fresno would need to replace some [six]-inch diameter water lines with [eight]-inch diameter water lines to improve hydraulic conditions and meet demands and fire service levels.  The water storage tank is planned for a property located on H Street, southeast of Ventura Avenue.  The regional transmission main would convey water from Well Site 172 and other wells in the vicinity to turnouts in the downtown area, including locations near [the] Mall.

40.

"Part of the future cumulative increase in water demand includes the water demand from cumulative growth that is anticipated to be induced by the development of [Option] 1 or 2. . . . [T]he growth that occurs from the reoccupation of current vacant office and retail space within the vicinity of [the] Mall will also result in a significant impact on existing water facilities, thus also requiring the new [three-]million gallon water storage tank and new regional transmission main discussed above. In addition, some [six]-inch diameter water lines may need to be replaced with [eight]-inch diameter water lines to improve hydraulic conditions to meet demands and fire service levels. . . . [T]he addition of the water supply facilities identified above will be adequate to support the re-occupancy of the buildings along [the] Mall.

"Although cumulative impacts on water facilities may be significant, the implementation of [Option] 1 or 2 would not directly increase the existing demand for water; therefore, [Option] 1 or 2 would not contribute to the potential significant cumulative impacts on existing water facilities projected with the implementation of future Downtown Fresno growth anticipated through the year 2035. Therefore, the implementation of [Option] 1 or 2 would result in no cumulative impacts on existing water facilities.

"**Stormwater Drainage Facilities**  [¶] . . . [¶]

"Storm drain facilities are located within the . . . Mall vicinity. A storm drain is located under [the] Mall between Inyo . . . and Tuolumne . . . . storm drains are located within Merced . . . between Van Ness [Avenue] and H Street, Fresno . . . between Van Ness [Avenue] and H Street, Mariposa . . . between Federal Alley and H Street, Tulare . . . between Home Run Alley and H Street, Kern . . . between Home Run Alley and Federal Alley, and along Home Run Alley between Kern . . . and Tulare . . . . Each of the existing drainage distribution facilities identified above are currently adequate to serve the existing uses . . . .

"The . . . [M]all is currently served by 95 storm drain inlets that collected surface flows from the [P]roject area. Adjacent streets such as Fresno and Tulare . . . also have their own storm drain facilities that convey flows from the roadway. Both the onsite and adjacent storm drain facilities presently connect with the existing storm drain facilities located throughout [the] Mall vicinity. These existing storm drain facilities are connected to one of several larger east-west and northeast-southwest trending trunk lines, which eventually connect with a series of existing drainage basins located along S. West Street in the southwestern portion of the City . . . . As previously stated, the existing subsurface drainage distribution facilities identified

41.

above are currently adequate to serve the existing uses found in the [P]roject area.

"**Project Impacts**

"[*Option*] *1*  [¶]  **No impact.**  Since [Option] 1 would result in generally the same amount of impervious surfaces within [the] Mall compared to existing conditions, there would not be an increase in stormwater flow from [the] Mall.  Although [Option] 1 would not result in an increase in stormwater flow, [Option] 1 will modify the location of the existing storm drain inlets. The existing storm drain inlets that are located within the future street (i.e., between the proposed curbs and gutters of each street) will be relocated to the curb face because the future streets will be designed to include a crown in the middle of the street so that surface water will flow to the curb face.

"The [P]roject will also include the reconstruction of the sidewalks adjacent to the future streets.  Therefore, there may be relocation of additional existing storm drain inlets.  The inlets may remain in the sidewalks or the sidewalk may be graded so that surface water flows to the street and eventually to the storm drain inlets at the curb face.

"Although the implementation of [Option] 1 will modify the location of the stormwater inlets throughout [the] Mall, the existing subsurface drainage distribution facilities will continue to be adequate to convey storm water from the . . . Mall vicinity after the implementation of [Option] 1.

"[*Option*] *2*  [¶]  **No impact.**  The determination of no impacts to existing storm drain distribution facilities as discussed above for [Option] 1 would be the same for [Option] 2.

"**Cumulative Impacts**  [¶]  **No impact.**  The implementation of [Option] 1 or 2 would not result in the construction of new storm water drainage distribution facilities or expansion of existing facilities.  Therefore, [Option] 1 or 2 would result in no cumulative impacts to existing storm water drainage facilities.

"**Water Supplies**  [¶] . . . [¶]

"Water supplies to the . . . Mall vicinity are limited by the existing water distribution facilities in the [P]roject vicinity.  These facilities are currently located within Federal Alley east of [the] Mall and within Home Run Alley and Congo Alley west of [the] Mall, respectively, between Inyo . . . and Tuolumne . . . .  These facilities range from [six]-inch to 12-inches in diameter.  Additional water distribution lines also ranging in diameter from

[six]-inch to 12-inches are located within Inyo . . . , Kern . . . , Tulare . . . , Mariposa . . . , Fresno . . . , and Tuolumne . . . .

"Based on a review of the City['s] . . . Urban Water Management Plan . . . , the City's water supply is provided by groundwater, treated surface water, recycled water, and conservation efforts. The City currently has existing water entitlements through a contract with the Fresno Irrigation District for water from the Kings River and a contract with the U.S. [B]ureau of Reclamation for water from the San Joaquin River. . . . [F]uture water supplies will increase primarily due to increases in the treated surface water, recycled water and addition[al] conservation efforts while decreasing reliance on groundwater supplies. The supplies identified by the City . . . are estimated to meet the City's demand from future growth beyond the next 20 years.

"**Project Impacts**

"[*Option*] *1*  [¶]  **No impact.**  The implementation of [Option] 1 would result in the demand for water supplies for irrigating the proposed landscaping as well as maintaining fountains. However, this demand for irrigation and maintenance is expected to be less than the current demand because there will be fewer fountains to maintain. The number of trees to irrigate under [Option] 1 is the same number as the existing trees. With a reduce[d] demand for water, the implementation of [Option] 1 will result in no impacts on water supplies from existing entitlements and resources. [¶] . . . [¶]

"[*Option*] *2*  [¶]  **No impact.**  The determination of no impact as discussed in [Option] 1 above would be the same for [Option] 2.

"**Cumulative Impacts**  [¶]  **No impact. . . .**  [T]he implementation of cumulative development will result in increases in the demand for water in Downtown Fresno. Part of this cumulative increase is the projected increase from the reoccupation of existing office and retail vacant space in the vicinity of [the] Mall as well as throughout Downtown Fresno. . . . [E]xisting water entitlements and projected water supplies are estimated to meet the City's demand from the development of cumulative projects as well as from the reoccupation of existing vacant space beyond the next 20 years. Therefore, cumulative projects will result in no impacts on water supplies from existing entitlements and resources. Since the implementation of [Option] 1 or 2 would not increase the demand for water, [Option] 1 or 2 would result in no cumulative impacts on water supplies from existing entitlements and resources.

43.

"**Wastewater Treatment Capacity**  [¶] . . . [¶]

"**Project Impacts**

"[*Option*] *1*  [¶]  **No impact. . . .**  [Option] 1 would not generate wastewater, and therefore, [Option] 1 would result in no impact on existing wastewater treatment capacity.

"[*Option*] *2*  [¶]  **No impact.**  The determination of no impact as discussed in [Option] 1 above would be the same for [Option] 2.

"**Cumulative Impacts.**  [¶]  **No impact. . . .**  [Option] 1 or 2 would result in no cumulative impacts on wastewater facilities.

"**Landfill Capacity**  [¶] . . . [¶]

"**Project Impacts**

"[*Option*] *1*

"*Construction Phase*  [¶]  **Less than significant impact.**  During the short-term construction phase, demolition activities will result in material that will need to be hauled offsite.  The material could be transported to a recycling center or the existing American landfill located west of the City . . . .  The amount of demolition material is not expected to result in a substantial amount of material that would substantially affect the existing landfill capacity.  Therefore, impacts to the existing landfill would be less than significant.

"*Operations Phase*  [¶]  **Less than significant impact.**  During the long-term operations phase, minor amounts of refuse may be generated during maintenance activities.  This minor amount of solid waste would result in a less than significant impact on existing landfills.

"[*Option*] *2*  [¶]  **Less than significant impact.**  The determination of less than significant impact on landfills discussed under [Option] 1 would be the same for [Option] 2.

"**Cumulative Impacts**  [¶]  **Less than significant impact.**  The contribution of potential solid waste during construction and operational activities associated with [Option] 1 or 2 would not be substantial and would be considered less than cumulatively considerable.  Cumulative impacts would be less than significant.

"**Compliance with Solid Waste Regulations and Statutes**  [¶] . . . [¶]

"**Project Impacts**

"[*Option*] *1*  [¶]  **Less than significant impact.**  Development under this [option] is not anticipated to conflict with federal, state, and local statutes and regulations related to solid waste because development is anticipated to comply with applicable . . . 2025 General Plan goals and policies and comply with the . . . Municipal Code requirements and diversion requirements regarding solid waste disposal.  Therefore[,] a less than significant impact is anticipated.

"[*Option*] *2*  [¶]  **Less than significant impact.**  The determination of less than significant impact on solid waste regulations and statutes described in [Option] 1 would be the same for [Option] 2.

"**Cumulative Impacts**  [¶]  **Less than cumulative impact.**  The proposed [P]roject would not contribute to conflicts with solid waste regulations and statutes and would result in less than cumulatively considerable impacts. Therefore, [P]roject impacts would be less than significant."

City released the draft EIR on November 26, 2013.  At the outset, the report

provided the following background:

"**1.2 – Project History**

"The [P]roject was originally identified to be assessed in a[n] . . . NOP . . . issued in April 2012.  That NOP provided that the City intended to prepare an EIR to assess the impacts from the adoption of the proposed . . . D[NC]P . . . , the proposed . . . FCSP . . . , and a Downtown Development Code (collectively 'Downtown Plans').

"The [P]roject was to be assessed in connection with the review of the FCSP because the FCSP identified revitalizing the . . . Mall as a top priority.  The . . . FCSP selected three options . . . to be further analyzed in the EIR that would be prepared to adopt the FCSP[.]  [¶] . . . [¶]  The purpose for the additional study in the EIR was to allow the [City] Council to elect one of the three options when the FCSP was adopted.

"The City has determined to prepare an EIR for the [P]roject now, independent of the FCSP or Downtown Plans, for three reasons: (1) because . . . the City has been awarded Federal grants for the [P]roject which require environmental review to be completed by February 2014; (2) because it is unlikely[,] or at least . . . uncertain, that the Downtown

Plans and the EIR to review those plans will be brought to [the City] Council before the Federal grant timelines run; and (3) the . . . Project has independent utility.

"In August 2012, the . . . FHWA . . . announced the award of $1 million from the . . . TCSP . . . Program to the City for preconstruction expenses for the [P]roject, and in September 2013, [DOT] announced that the City . . . had been awarded nearly $16 million in . . . TIGER . . . funding for . . . construction expenses.

"As a result of receiving the grant awards, a National Environmental Policy Act (NEPA)[28] environmental assessment must be prepared for the [P]roject, and otherwise treat the [P]roject as a federal undertaking by the FHWA . . . . Caltrans, the designated agency for FHWA NEPA review, is currently preparing the necessary NEPA documents for the [P]roject.

"The TIGER grant requires that obligation of the construction funds must occur no later than September 30, 2014. This means that Caltrans and FHWA must have approved the [P]roject with the fully complete engineering drawings, ready for bid, finalized after the adoption or certification of both federal and state environmental reviews. To meet this deadline, the EIR for the [P]roject will need to be certified by February 2014. [¶] . . . [¶]

"When the [NOP] was issued in April 2012, it was expected that the DNCP and the FCSP would be brought to [the City] Council in 2013. However, delays have occurred for several reasons, not limited to the City needing to find a new environmental consultant as a result of a business disruption of the City's hired consultant that was outside the City's control. Additionally, when the DNCP and FCSP were initiated and first being drafted, the City had not started on the . . . General Plan and Development Code Update. The City has drafted and released to the public for comment Preliminary Workshop Discussion Drafts of various chapters of the proposed General Plan Update. Since the DNCP and FCSP have yet to be approved, the City is currently planning to bring the D[NC]P and the FCSP to [the City] Council after the General Plan and Development Code Update. Based upon all of this, particularly given the many complicated issues that the FCSP, DNCP, and the General Plan and Development [C]ode Update must address in preparation for adoption, the City determined that it would be unrealistic to expect the combined DNCP/FCSP and . . . Mall environmental review to be completed in time to meet TIGER deadlines. It

---

**28**   Title 42 United States Code section 4321 et seq.

is in light of the TIGER grant, therefore, that the City is preparing this new CEQA document, which addresses the [P]roject on its own, and is also focused on the Project as being conditioned on the allowed purposes of the TIGER grant funds. [¶] . . . [¶]

"**2.2 – Project Objectives**

"The following are the objectives of the proposed [P]roject[:]

"[(1)] Reconstruct [the] Mall . . .

"[(2)] Increase mobility and access in the . . . Mall area

"[(3)] Provide convenient multi-modal access options on the Mall and its cross streets

"[(4)] Improve visibility of businesses, offices[,] and other amenities in the . . . Mall area by improving traffic circulation

"[(5)] Maximize sustainable development and economic productivity in conjunction with other downtown redevelopment projects while respecting, incorporating, and minimizing harm to the historic . . . Mall landscape and its contributing features[29]

"[(6)] Provide greater long-term public use of [the] Mall

"[(7)] Secure funds for the reconstruction of [the] Mall[30]

"**2.3 – Project Description**

"The City . . . proposes to reconstruct [the] Mall as a complete street by reintroducing vehicle traffic lanes to the existing pedestrian mall. The Mall

---

[29] This objective is reworded in Section 6 (Alternatives to the Proposed Project) of the draft EIR:

"[(5)] Maximize sustainable development and economic productivity in conjunction with other downtown redevelopment projects while complying with the requirement to receive federal transportation grant funds to minimize harm to the historic site resulting from the Project."

[30] This objective is reworded in Section 6 (Alternatives to the Proposed Project) of the draft EIR:

"[(7)] Reconstruct [the] Mall using funds and other sources, including grants, other than the . . . General Fund[.]"

consists of six linear blocks that were open to traffic prior to 1964 but now do not allow public vehicle access. The Mall is bounded by Tuolumne Street to the north and Inyo Street to the south, and includes portions of three cross streets. The total length of the new roadways would be approximately 0.67 mile; a total of 0.74 mile of existing . . . Mall right-of-way would be affected.

"The . . . Mall . . . refers specifically to the pedestrian areas between adjoining buildings located on the former City streets of Fulton, Mariposa, Merced, and Kern, which function as an integrated pedestrian mall. Fresno Street and Tulare Street, which do allow vehicle traffic, run through the Mall and divide it into three roughly equal sections. Mall landscaping elements include fountains, planters, benches, sculptures, electrical systems, irrigation systems, and two 'tot lots.' The Mall does not include the adjoining buildings or their facades.

"The City . . . is proposing two build options for the . . . Project. These two build options propose to reconstruct the Mall using 'complete streets' design concepts. Complete streets are those designed to function as shared public space, or as 'living streets'—for pedestrians, cyclists, outdoor businesses, and slow-moving, cautiously driven vehicles. Complete streets may include narrow roadways, corner bulb-outs, winding streets, and other traffic calming measures to lower driving speeds; street trees and other landscape elements; wide pedestrian sidewalks and crosswalks; and bicycle accommodations such as dedicated bicycle lanes or wide shoulders. The purpose of incorporating these design concepts into the proposed [P]roject is to retain portions of the historic fabric and character of the Mall, maintaining the key elements, feeling[,] and unique experience of a pedestrian mall in [D]owntown Fresno. [¶] . . . [¶]

"**2.3.1 – Project Option 1**

"Option 1 consists of reopening the . . . Mall with two-way streets, with one lane of vehicular traffic in each direction alongside bicycle, pedestrian, and potentially other travel modes, along the length of the . . . Mall and three cross streets: Merced between Congo Alley and Federal Alley, Mariposa between Broadway Plaza and Federal Alley, and Kern between Fulton and Federal Alley. Approximately 162 on-street vehicle parking spaces would be reintroduced along the length of the . . . Mall (plus 28 new spaces along cross streets), mid-block pedestrian crossings would be provided, and construction of streetscape improvements would optimize the streets for the new blend of travel modes. One 11-foot-wide vehicle travel lane would run in each direction, with a parallel parking lane of [eight] feet included on both sides of the streets. Sidewalks would include a typical 14-foot

48.

sidewalk on one side of the street and a 28-foot-wide promenade on the other. This promenade is intended to approximate the mall-like pedestrian experience of the original . . . Mall. Like the existing [M]all, the Option 1 promenade would feature artworks, water features, seating, and trees and would allow for walking and pedestrian-only seating, landscaping, and lighting. Pedestrians would be separated from vehicles. There are existing street rights-of-way adjacent to the new streets within the Mall that would include minor public infrastructure improvements such as new curb locations, traffic signal improvements, and lane striping. These improvements would provide transitional streetscape to accommodate the [P]roject. Under Option 1, the two tot lots present, one located near the corner of Merced and Fulton, and the other located near the corner of Kern and Fulton, would be consolidated into one larger tot lot (approximately 1,772 square foot area) . . . near the intersection of Mariposa and Congo Alley.

"**2.3.2 – Project Option 2**

"Option 2 consists of reconnecting the street grid similar to Option 1, but would include rebuilding distinctive elements of the . . . Mall in five to six specific locations, known as 'vignettes,' in their exact current size and configuration. The vignettes are intended to preserve existing shade trees and features of the historic Eckbo design, and would include many of the existing elements (sculptures, fountains, pavement pattern, trees, and so on). To accomplish this, the street would have gentle curves that would allow for greater preservation of historic features including fountains, art[,] and existing shade trees. One 11-foot-wide vehicle travel lane would run in each direction and would curve through the vignettes. Outside the vignette areas, the street would straighten, and the landscape would include, where possible, an [eight]-foot-wide parallel parking lane, as well as a pedestrian-only walking, seating, vegetation, and public art area that varies between 14 and 44 feet wide each side of the street. Within the vignettes, there would be no parking lane, and the existing . . . Mall landscape elements would be kept intact as much as possible. A total of 52 on-street vehicle parking spaces would be reintroduced along the length of the . . . Mall, plus 30 new spaces along cross streets. The remaining space on each side of the street would be dedicated to pedestrian travel, seating, vegetation, and artwork. There are existing street rights-of-way adjacent to the new streets within the Mall that would include minor public infrastructure improvements such as new curb locations, traffic signal improvements, and lane strip[]ing. These improvements would provide transitional streetscape to accommodate the [P]roject. Under Option 2, the two tot lots present, one located near the corner of Merced and Fulton, and the other located near the corner of Kern

49.

and Fulton, would be consolidated into one larger tot lot (approximately 1,772 square foot area) . . . near the intersection of Mariposa and Congo Alley. [¶] . . . [¶]

"**3.1 – Project Environmental Setting**

"The [P]roject site is a pedestrian mall that contains various features. These features include pavement with a pattern that resembles the contours of the natural landscape, trees, shrubs, flowers, planters, seating areas, benches, sculptures, water features, and two tot lots. The overall appearance of the [P]roject site is that it is minimally maintained[:] the pavement is dirty, with numerous areas of food stains, discarded chewing gum, cigarette butts, and . . . crack[s]. . . . The trees include roots that have cracked the pavement in numerous locations. Many of the planter walls and curbs are cracked. Some sculptures have been vandalized and others are not prominently displayed or identified. Some of the fountains have also been vandalized and have been inoperable for many years. The plaster on the fountains is cracked and the pumps and/or lighting are inoperable and have become repositories for debris, discarded bits of food, and cigarette butts.

"Immediately adjacent to the [P]roject site are the buildings that line [the] Mall. These buildings consist of one, two, three, and multiple-story structures. . . . Because of the ground floor vacancies within [the] Mall, which is approximately 26 percent, many of the businesses have industrial-looking metal gates that extend across the storefront indicating that the building space is vacant and abandoned.

"[The] Mall as well as the area immediately adjacent to [the] Mall includes various land uses. The area adjacent to [the] Mall is bordered by Van Ness Avenue on the east, Inyo Street on the south, Broadway/H Street on the west, and Tuolumne Street on the north. . . . Within this area, there are office, retail/restaurant, recreation-clubhouse, other commercial such as a hotel and theater, and residential. The structures located along [the] Mall include multiple stories with storefronts on the ground floor and additional uses within the upper stories. . . . [¶] . . . [¶]

"The [P]roject vicinity also includes surface parking, structured parking, and a vacant lot. This area includes approximately 2,800 parking spaces. Approximately 75 percent of those spaces are located within structures while 25 percent of the parking spaces are within surface parking lots. There are 14 on-street parking spaces located on Merced . . . and Kern . . . west of Van Ness Avenue and east of Fulton . . . . There is one vacant lot at the southwest corner of Tulare Street and Van Ness Avenue. The vacant lot encompasses approximately 20,000 square feet (sq[.] ft[.]).

50.

"In addition to land uses within the existing structures along [the] Mall, there are two recreational areas for children within [the] Mall.  These areas are tot lots with playground equipment and sand areas.  One of the tot lots is located within [the] Mall immediately north of Kern . . . and encompasses 966 sq[.] ft[.] of active play equipment area.  The second tot lot is also within [the] Mall immediately south of Merced . . . and encompasses 806 sq[.] ft[.] of active play equipment area. . . .  Today most, though not all, of this equipment remains functional for the children to use.

"**3.2 – Cumulative Environmental Setting**

"In the vicinity of [the] Mall, there are various development applications that have been submitted to the City.  In addition to these development projects, future developments in accordance with two currently proposed plans are also identified as cumulative future projects.  Together, these current and future projects represent the related projects that are considered within the cumulative impact evaluations prepared in . . . this [d]raft EIR. . . .[31]  [¶] . . . [¶]

"In addition to the development projects in the vicinity of [the] Mall, there are various development projects proposed beyond the vicinity of [the] Mall and within Downtown Fresno. . . .[32]  [¶] . . . [¶]

"In addition to the development projects that are identified above, the implementation of the . . . DNCP . . . and the . . . FCSP . . . , if adopted by

---

**31**     These projects include:  (1) construction of a pharmacy at the corner of Van Ness Avenue and Tuolumne Street; (2) tenant improvements for new federal offices at 1155 Fulton; (3) tenant improvements for a new restaurant at 1101 Fulton; (4) tenant improvements for residential units at 959 Fulton; (5) tenant improvements for a restaurant lounge at the Pacific Southwest Building; (6) tenant improvements for stores at the Hotel Californian; (7) storm drain replacement in the middle of the Mall between Inyo Street and Tuolumne Street; (8) water line replacement on Kern between Federal Alley and Home Run Alley; (9) water line replacement on Mariposa between Federal Alley and Congo Alley; (10) sewer line replacement on Kern between Van Ness Avenue and Home Run Alley; (11) sewer line replacement on Merced between Van Ness Avenue and Congo Alley; and (12) a redesign of Mariposa Plaza.

**32**     These projects include:  (1) a new pedestrian crossing along Van Ness Avenue at Mariposa; (2) a bus stop along Van Ness Avenue at Mariposa; (3) a high-speed rail station along existing Union Pacific railroad tracks between Fresno Street and Tulare Street; and (4) various residential projects in the FCSP area but outside the Mall area, including approximately 350 new housing units in the Cultural Arts District and the area known as Chinatown.

the City, is expected to facilitate infill development through permitting procedures designed to expedite project approvals and clear design standards and guidelines for projects within the boundaries of the plans. . . ."

The draft EIR proceeded to evaluate the Project's significant effects on short-term visual character and historical resources:

"**4.1 – Aesthetics**  [¶] . . . [¶]

"**4.1.5 – Impact Analysis and Mitigation Measures**

"**Visual Character**  [¶] . . . [¶]

"*Project Impact Analysis*

"*Project Option 1*[:]  [¶]  Implementation of Project Option 1 would temporarily remove the sculptures from [the] Mall for rehabilitation prior to grading activities.  Three of the fountains that are located along Kern . . . , west of Fulton, would remain.  The remaining 18 fountains would be removed.  There are 14 of the remaining 18 fountains that have not been operable for years because plaster is cracked, pumps and/or lighting are inoperable, and the fountains have become repositories for debris, discarded bits of food, and cigarette butts.  Approximately 151 of the 154 trees as well as the planters, shrubs, and seating area would be removed during grading activities, and three trees would remain.  The most prominent visual alteration during grading activities would be the removal of the existing mature trees.  Currently, the trees within the Mall provide a visual relief as well as shade.  The removal of the existing trees will result in a significant impact on the visual character of the . . . Mall area.

"*Project Option 2*[:]  [¶]  Implementation of Project Option 2 would temporarily remove the sculptures from [the] Mall for rehabilitation prior to grading activities.  Twelve of the existing fountains—nine in vignettes and three on Kern . . . , west of Fulton—would remain.  The remaining [nine] fountains would be removed.  Although there are 14 fountains that have not been operable for years because plaster is cracked, pumps and/or lighting are inoperable, and the fountains have become repositories for debris, discarded bits of food, and cigarette butts, . . . Option [2] would refurbish/rehabilitate five of the currently inoperable fountains. Approximately 124 of the 154 trees as well as the planters, shrubs, and seating area would be removed during grading activities, and 30 trees would remain.  The most prominent visual alteration during grading activities would be the removal of the existing mature trees.  Currently, the

52.

trees within the Mall provide a visual relief as well as shade.  The removal of the existing trees will result in a significant impact on the visual character of the . . . Mall area.

"***Cumulative Impact Analysis***[:]  [¶]  The implementation of cumulative development within the Downtown Fresno area could alter the existing visual characteristics.  This alteration could occur through the implementation of the proposed DNCP and FCSP as well as current development projects in the . . . Mall area.  Since the implementation of Project Options 1 and 2 will result in a short-term significant and unavoidable impact on the existing visual quality of [the] Mall, Project Options 1 and 2 could contribute to significant cumulative impacts on the existing visual quality of Downtown Fresno.  The contribution is considered to be considerable and significant.  The following mitigation measures are recommended to reduce the short-term visual quality impacts.

"***Mitigation Measures***

"*Project Option 1*

"**MM AES**[33]**-1**[:]  Trees that are removed shall be replaced with a new tree at a 1:1 ratio within the . . . Mall right-of-way.  Currently, the City is planning to replant approximately 132 new trees.  The replacement trees shall be consistent with the landscape palette and design approved by the Parks Director and the Public Works Director.

"**MM AES-2**[:]  Replacement trees to be planted shall be of varying sizes that range from 15 gallon to 36-inch box.  Each replacement tree shall have root barriers to prevent sidewalk upheaval from roots.

"*Project Option 2*

"The implementation of [MM] AES-2 is required.

"**MM AES-3**[:]  The City shall replace approximately 70 trees within the . . . Mall right-of-way.  The replacement trees shall be consistent with the landscape palette and design approved by the Parks Director and the Public Works Director.

---

**33**    "AES" refers to "Aesthetics – Short-term Visual Character."

53.

"*Level of Significance After Mitigation*

"*Project Option 1*[:]  [¶]  With the implementation of [MM] AES-1 and [MM] AES-2, Project Option 1 would include the replanting of approximately 118 to 132 new trees of varying sizes within the rights-of-way of [the] Mall.  The replanting of the trees would eventually provide substantial visual relief and shade within the . . . Mall area.  However, similar visual relief and shade would not be provided by the replanted trees until the trees are mature which could be for approximately [five] to 10 years.  Therefore, the alteration of the visual character of [the] Mall area would be substantial during the short-term that is approximately [five] to 10 years.  Therefore, implementation of Option 1 would result in a significant short-term impact on the visual character of the . . . Mall area.

"*Project Option 2*[:]  [¶]  With the implementation of [MM] AES-2 and [MM] AES-3, Option 2 would include the replanting of approximately 70 trees of varying sizes within the rights-of-way of [the] Mall.  The replanting of the trees would eventually provide substantial visual relief and shade within the . . . Mall area.  However, similar visual relief and shade would not be provided by the replanted trees until the trees are mature which could be for approximately [five] to 10 years.  Therefore, the alteration of the visual character of [the] Mall area would be substantial during the short-term that is approximately [five] to 10 years.  Therefore, implementation of Option 1 would result in a significant short-term impact on the visual character of the . . . Mall area.

"*Cumulative*[:]  [¶]  Similar to the discussions above, the implementation of [MM] AES-1 and [MM] AES-2 for Option 1 and [MM] AES-2 and [MM] AES-3 for Option 2 would reduce visual character impacts associated with Option 1 or 2.  However, similar visual relief and shade would not be provided by the replanted trees until the trees are mature which could be for approximately [five] to 10 years.  Therefore, the alteration of the visual character of [the] Mall area would substantially contribute to potential short-term cumulative visual character impacts.  Project Option 1 or 2 would result in a short-term visual character cumulative impact that is significant and unavoidable until the replanted trees are mature which could be for approximately [five] to 10 years.

"**4.2 – Historical Resources**  [¶] . . . [¶]

"**4.2.5 – Impact Analysis and Mitigation Measures**

"**Historical Resources**  [¶] . . . [¶]

"***Project Impact Analysis***[:] [¶] The . . . Project would completely remove the existing Mall and introduce a two-lane, two-way street with oversized sidewalks, stately trees, and on-street parking throughout the . . . Mall and its cross streets. [¶] It is proposed that the . . . Mall be reopened to vehicular traffic and the pedestrian-only qualities of the Mall be removed. The . . . Mall was listed on the CRHR[34] as a landmark example of 1960's era pedestrian-oriented urban landscaping. Regular vehicle use on what was formerly Fulton Street and the cross[]streets was almost completely restricted once built, and this restriction is a key element to the uniqueness of the Mall as a historical resource.

"***Project Option 1***[:] [¶] **Direct Impacts**[:] [¶] The development of Project Option 1 would remove the existing Mall's character-defining features and materials including the pavement that includes stained concrete inlaid with sweeping curvilinear ribbons of concrete aggregate. Project Option 1 would also include the removal of the majority of the shade trees and shrubs, majority of the fountains and water features, shade pavilions, and seating areas. The sculptures will be removed temporarily during construction, renovated/restored, and then placed back within the wide sidewalks. The [P]roject will include replacement trees and shrubs as well as replicate the stained pavement with curvilinear ribbons within the proposed sidewalk areas. Even though the [P]roject includes replacement of some of the Mall's character-defining features and materials, the removal of many of them as well as the introduction of automobile traffic within [the] Mall, including the cross malls, would alter the . . . Mall such that it would no longer retain the integrity of location, design, setting, materials, workmanship, feeling, or association. . . .

"**Location** is defined as 'the place where the historic property was constructed or the place where the historic event occurred.' Since most of the character-defining hardscape and landscape features would be removed from their historic location, the . . . Mall would no longer retain integrity of location.

"**Design** is defined as 'the combination of elements that create the form, plan, space, structure, and style of a property.' Removing most of the . . . Mall's landscape and hardscape features would significantly alter the form, plan, space, structure and style of the Mall, and it would no longer retain integrity of design.

---

**34** "CRHR" refers to the California Register of Historical Resources.

55.

"**Setting** is defined as the physical environment of a historic property. Most of the Mall's character-defining hardscape and landscape features would be removed, and automobile traffic would be introduced to areas that Mr. E[c]kbo designed as pedestrian-only spaces.  These actions would significantly alter the setting, and the . . . Mall would no longer retain its integrity of setting.

"**Materials** are defined as 'the physical elements that were combined or deposited during a particular period of time and in a particular pattern or configuration to form a historic property.'  Since most of the character-defining hardscape and landscape material would be removed under Option 1, the . . . Mall would no longer retain integrity of materials.

"**Workmanship** is defined as 'the physical evidence of the crafts of a particular culture or people during any given period in history or prehistory.'  The character-defining hardscape and landscape features of the . . . Mall embody the particular craftsmanship of both landscape designer Garrett Eckbo and the individual artists commissioned to provide sculptures and mosaics.  Since most of the original hardscape and landscape features would be removed, the . . . Mall would no longer retain integrity of workmanship.

"**Feeling** is defined as 'a property's expression of the aesthetic or historic sense of a particular period of time.'  The . . . Mall is historically significant in part for its association with post-World War II landscape design and the mid-20th century trend for pedestrian malls as a redevelopment scheme. These associations are expressed not only through the Mall's individual design elements but in how these elements are arrayed and integrated along several street blocks closed to automobile traffic.  Option 1 would remove most of the original hardscape and landscape features, and those features that remain would be interrupted by a traditional street.  The original expression of a linear, pedestrian landscape traversing several blocks would be lost, and the . . . Mall would no longer retain integrity of feeling.

"**Association** is defined as 'the direct link between an important historic event or person and a historic property.'  The . . . Mall is historically linked to its designer, master landscape architect Garrett Eckbo, because the original implementation of his design remains largely intact today.  Option 1 would remove most of the original hardscape and landscape features and those features that would be returned after construction would be located within the existing rights-of-way; however, the features that would be returned would no longer work together as an integrated whole.  Garrett Eckbo's original vision of a continuous linear landscape would no longer

56.

be discernible, and the . . . Mall would no longer retain integrity of association.

"In summary, the proposed removal of most of original hardscape and landscape features and the introduction of automobile traffic to a previously pedestrian-only thoroughfare would alter the . . . Mall such that it would no longer retain integrity of location, design, setting, materials, workmanship, feeling, or association.  Subsequently, the . . . Mall would no longer be eligible for the National Register [of Historic Places] or the [CRHR].  Therefore, the implementation of Option 1 would result in a significant and unavoidable impact to the . . . Mall.

"**Indirect impacts**[:]  [¶]  The removal of [the] Mall would also alter the landscape adjacent to existing structures that are along [the] Mall.  The re-opening of [the] Mall to automobile traffic would have a positive indirect effect on the pre-1964 structures that are located directly adjacent to the . . . Mall.  This positive indirect effect would occur because the . . . Mall was designed and constructed downtown after all of the locally important buildings were constructed.  The removal of the Mall would return the downtown core to a pre-Mall historical state by returning Fulton Street and its cross streets.  Therefore, the implementation of Option 1 would result in an indirect beneficial impact on the pre-1964 structures located adjacent to [the] Mall.

"*Project Option 2*[:]  [¶]  **Direct Impacts**[:]  [¶]  This option removes the entire pedestrian . . . Mall and introduces a two-lane, two-way street with 12[-] to 20-foot wide sidewalks through the . . . Mall and its cross streets.  This option includes keeping selected original features in their original Mall contexts through the construction of vignettes, in a manner that provides improved retail visibility and some on-street parking.  Existing artwork will be restored in place and other artwork will be relocated within the boundaries of the existing rights-of-way of [the] Mall and the cross malls.  This option also includes removing approximately 224 trees, retaining approximately 30 trees, and planting approximately 224 trees.  Many of the fountains, water features, and seating areas and all of the shade pavilions would be removed throughout the majority of the Mall.

"The development of Option 2 would remove a majority of the existing Mall's character-defining features and materials including the removal of the stained concrete pavement inlaid with sweeping curvilinear ribbons of concrete aggregate.  This option includes retaining original Mall landscape within areas known as vignettes.  Of the six blocks along Fulton Street that comprise [the] Mall, approximately 2.5 non-contiguous blocks would retain the original Mall context, dispersed as six vignettes throughout the length

57.

of Fulton Street between Inyo Street and Tuolumne Street. This option also includes the installation of stained concrete pavement with ribbons in the sidewalk areas.

"Even though the [P]roject includes replacement of some of the Mall's character-defining features and materials, the removal of the majority of them as well as the introduction of automobile traffic within [the] Mall, including the cross malls, would alter the . . . Mall such that it would no longer retain the integrity of location, design, setting, materials, workmanship, feeling, or association. . . .

". . . Since the majority of the character-defining hardscape and landscape features would be removed from their historic location, the . . . Mall would no longer retain integrity of location.

". . . Removing the majority of the . . . Mall's landscape and hardscape features would significantly alter the form, plan, space, structure and style of the Mall, and it would no longer retain integrity of design.

". . . The majority of the Mall's character-defining hardscape and landscape features would be removed, and automobile traffic would be introduced to areas originally designed as pedestrian-only spaces. These actions would significantly alter the setting of those portions of the Mall that would remain as 'vignettes.' Subsequently, the . . . Mall would no longer retain its integrity of setting.

". . . Since the majority of the character-defining hardscape and landscape material would be removed under Option [2], the . . . Mall would no longer retain integrity of materials.

". . . The character-defining hardscape and landscape features of the . . . Mall embody the particular craftsmanship of both landscape designer Garrett Eckbo and the individual artists commissioned to provide sculptures and mosaics. Since the majority of the original hardscape and landscape features would be removed, the . . . Mall would no longer retain integrity of workmanship.

". . . The . . . Mall is historically significant in part for its association with post-World War II landscape design and the mid-20th century trend for pedestrian malls as a redevelopment scheme. These associations are expressed not only through the Mall's individual design elements but in how these elements are arrayed and integrated along several street blocks closed to automobile traffic. Option 2 would remove the majority of the original hardscape and landscape features and those features that remain

would be interrupted by a traditional street. The original expression of a linear, pedestrian landscape traversing several blocks would be lost, and the . . . Mall would no longer retain integrity of feeling.

". . . The . . . Mall is historically linked to its designer, master landscape architect Garrett Eckbo, because the original implementation of his design remains largely intact today. Option 2 would remove the majority of the original hardscape and landscape features, and those features that remain would be isolated as individual 'vignettes' that no longer work together as an integrated whole. Garrett Eckbo's original vision of a continuous linear landscape would no longer be discernible, and the . . . Mall would no longer retain integrity of association.

"In summary, the proposed removal of the majority of original hardscape and landscape features and the introduction of automobile traffic to a previously pedestrian-only thoroughfare would alter the . . . Mall such that it would no longer retain integrity of location, design, setting, materials, workmanship, feeling, or association. Subsequently, the . . . Mall would no longer be eligible for the National Register [of Historic Places] or the [CRHR]. Therefore, the implementation of Option 2 would result in a significant and unavoidable impact to the . . . Mall.

"**Indirect impacts**[:] [¶] The removal of [the] Mall would also alter the landscape adjacent to existing structures that are along [the] Mall. The re-opening of [the] Mall to automobile traffic would have a positive indirect effect on the pre-1964 structures that are located directly adjacent to the . . . Mall. This positive indirect effect would occur because the . . . Mall was designed and constructed downtown after all of the locally important buildings were constructed. The removal of the Mall would return the downtown core to a pre-Mall historical state by returning Fulton Street and its cross streets. Therefore, the implementation of Option 2 would result in an indirect beneficial impact on the pre-1964 structures located adjacent to [the] Mall.

"*Cumulative Impacts Analysis*[:] [¶] Cumulative development includes various development applications that have been submitted to the City in the vicinity of [the] Mall and potential development in accordance with the DNCP and FCSP, if approved. A few of the development applications include storm drain, water, and sewer replacement facilities within [the] Mall, including Kern, Mariposa and Merced. These potential projects could result in impacts to some of the features of [the] Mall including the stained concrete pavement inlaid with sweeping curvilinear ribbons of concrete aggregate. In addition, one of the potential projects includes the re-introduction of store fronts on the Hotel Californian along Kern . . . .

59.

The Hotel Californian is listed on the National Register of Historic Places, and the re-introduction of storefronts could impact the historic resource; however, the modifications to the Hotel Californian would be required to follow the Secretary of the Interior's Standards and thus would not lead to an adverse impact to this resource. The future implementation of the DNCP and FCSP may result in partial or whole demolition of historic resources, but these potential impacts are speculative because no specific development applications have been submitted since these two downtown plans have not been approved, and both of these plans could be implemented without affecting a[] historic resource. Overall, the implementation of cumulative development could result in impacts to historic resources. Together with the implementation of Option 1 or 2, cumulative development would result in a significant impact. Since Option 1 or 2 would significantly impact the . . . Mall, the impact on historical resources from Option 1 or 2 would be cumulatively considerable, and therefore would be a significant cumulative impact.

"*Mitigation Measures*  [¶] . . . [¶]

"**Project Option 1**

"**MM HR[35]-1**[:]  Prior to demolition, the City shall have archival documentation (Historic American Building Survey [HABS] level 1 documentation) prepared for the . . . Mall landscape. HABS Level 1 documentation shall consist of the following:  [¶] . . . Architectural and historical narrative[;]  [¶] . . . Adequate archival drawings as available[;] [¶] . . . Historical photographs as available[; and]  [¶] . . . Archival photographs documenting all character-defining features, as well as context views.

"**MM HR-2**[:]  An interpretive program shall be developed using plaques, photographs, drawings and text, etc. informing the public about Garrett Eckbo, and the . . . Mall as an important example of mid-20th century landscape design.

"*Project Option 2*[:]  [¶]  Implementation of [MM] HR-1 and [MM] HR-2 are required.

"*Cumulative*[:]  [¶]  Implementation of [MM] HR-1 and [MM] HR-2 are required.

---

**35**    "HR" refers to "Historical Resources."

"*Level of Significance After Mitigation*

"*Project Specific*[:]  [¶]  Since the objective of the . . . [P]roject is to introduce automobile traffic and parking to a previously pedestrian-only thoroughfare and [the Project] require[s] t[he] remov[al] [of] the existing Mall landscape and hardscape features within the portion of the right-of-way proposed for the two-lane, two-way street, mitigation measures for Project Option 1 or 2 are not available to reduce the impact to historical resources to less than significant.  Implementation of [MM] HR-1 and [MM] HR-2 will document and memorialize the . . . Mall landscape; however, impacts to the . . . Mall will remain significant.

"*Cumulative*[:]  [¶]  Project Options 1 and 2 would significantly contribute to cumulative impacts to historical resources.  The implementation of [MM] HR-1 and [MM] HR-2 will document and memorialize the . . . Mall landscape; however, impacts to the . . . Mall will remain significant. Therefore, Project Options 1 and 2 would result in significant cumulative impacts."

The initial study's discussion on the Project's insignificant effects on air quality, greenhouse gas emissions, public services, recreation, traffic, and utilities (see *ante*, pp. 13-45) was appended to and incorporated into the substantive content of the draft EIR.

The draft EIR also addressed growth-inducing impacts:

"The proposed [P]roject under [Options] 1 or 2 would eliminate the . . . Mall and introduce two-way streets that would provide vehicular interconnectivity to adjacent roadways.  No new businesses or housing [are] proposed.  Since the [P]roject vicinity is already developed, the introduction of the new streets would not directly induce new development and would not affect the regional population and housing characteristics of the City.

"Although the [P]roject would not include any additional development within the [P]roject area, the provision of streets will increase access to the area.  The increase in access is anticipated to influence growth within the [P]roject area.  This growth is anticipated to occur through the reoccupation of the ground floors of existing vacant buildings as vehicle access and parking become available.

". . .  [T]he reopening of Fulton Street and adding on-street parking [are] anticipated to reduce the ground floor retail vacancies from 26 percent to

61.

nine percent under [Option] 1 and to 15 percent under [Option] 2. In addition, the reopening of Fulton Street and adding on-street parking [are] anticipated [to] reduce office vacancies within [the] Mall from 46 percent to 17 percent under both [Options] 1 and 2. Interest in developing Downtown Fresno overall has been on the rise for several years. Since the density along [the] Mall is so much greater than other areas, activity in the immediate vicinity of [the] Mall fuels itself, and the increases in economic productivity expected to occur as a result of implementing [Options] 1 or 2 are substantial.

"Although the [P]roject would result in the indirect inducement of growth[,] including population growth[,] within the . . . Mall area, this inducement would result in the reoccupation of previously vacated buildings adjacent to [the] Mall. This reoccupation of existing vacant buildings would be consistent with approved City land use plans and would not affect the regional population characteristics of the City. No significant indirect growth inducing impact would occur with the implementation of [Options] 1 or 2."

The draft EIR examined several alternatives to the proposed Project, including Option 3 and Alternative 6.3.4:

"**6.2.1 – Restoration and Completion**

"This Alternative, known as 'Option 3' in the draft [FCSP] and preliminary design work, would keep . . . Fulton . . . , Merced . . . , Mariposa . . . , and Kern . . . in their original pedestrian-only configurations. The entire [M]all as envisioned and realized by Garrett Eckbo, including all of its features and details (fountains, pavement, plantings, lighting, and so on), would be renovated and the existing artwork restored in place. Various design improvements would be introduced, including more lighting, new restrooms, and better way-finding signage.

"The implementation of [Option 3] would include the reconstruction and rehabilitation of the Mall and its contributing features consistent with the Secretary of the Interior Standards for the Rehabilitation of Historic Properties. [Option 3] would avoid the significant and unavoidable adverse impact on the . . . Mall, a[] historic resource which is eligible for listing in the National Register of Historic Places.

"[Option 3] would not increase mobility within the Mall area and would not increase access to the Mall storefronts because no additional access to the Mall would be provided. In addition, [Option 3] would not add any on-street vehicle parking spaces along the length of the . . . Mall and cross

streets. [Option 3] would not provide for multi-modal access options on the Mall and its cross streets because it would remain pedestrian oriented. Since no new streets would be constructed adjacent to the Mall, the visibility of the businesses, offices, and other amenities in the . . . Mall would not be improved. . . . [Option 3] would reduce ground floor vacancies from 26 percent to 20 percent and would increase annual gross retail sales by $6.1 million. In comparison to Project Options 1 and 2, [Option 3] would result in greater ground floor vacancies (approximately 5 to 11 percent more vacancies) and less annual gross retail sales (approximately $17.2 million to $40.9 million less annual gross retail sales). [Option 3] would not maximize sustainable development and economic productivity in conjunction with other downtown redevelopment projects while complying with the requirement to receive federal transportation grant funds to minimize harm to the historic site resulting from the Project. [Option 3] would provide greater public use of the Mall; however, given the historic use of the Mall, the long-term public use of the Mall may not be greater than the current use. The current federal grants secured by the City for the . . . Project would not qualify for use by [Option 3]. Transportation projects throughout the City each year have been funded through federal, State, and local funds and no direct funds from the . . . General Fund because the City does not allocate General Fund monies for transportation projects within the City. At this time, City staff is unaware of funding sources that are available to fund [Option 3], and there is no reasonable expectation to obtain funding for [Option 3]. [¶] . . . [¶]

"Based on the above discussion, although [Option 3] would avoid a significant and unavoidable impact on a[] historic resource, it would fail to meet most of the basic project objectives. In addition, [Option 3] is considered infeasible because construction funds, or reasonable expectation to obtain funds, are not available . . . , substantial annual economic subsidies would be needed, and there is no reasonable expectation that these annual subsidies would be available. [¶] . . . [¶]

## "6.3.4 – Keep South and Center Three Blocks Closed

"This Alternative would maintain three blocks of the . . . Mall, keeping the . . . Mall between Fresno and Kern . . . as a pedestrian-only facility. It would transform the two northern blocks of Mariposa, Merced[,] and Fulton . . . and the one southern block of Kern and Fulton . . . into standard streets. It would restore the remaining Eckbo features and restore existing artwork, moving the art elsewhere within the Fulton Corridor, where necessary. This Alternative would reconstruct the Mariposa Plaza,

63.

facilitate outdoor dining, and introduce more lighting, new restrooms, better signage[,] and new streetscape and artwork in selected locations.

"**Impact Analysis**

"*Aesthetics*  [¶]  Under this Alternative, the features within three blocks of the . . . Mall that are along the Fulton alignment (fountains, pavement, plantings, lighting, and so on) would be renovated, and the existing artwork restored in place.  This Alternative would reconstruct more than half of the existing . . . Mall with standard streets.  The mature trees within the three blocks of [the] Mall that are bordered by Kern . . . on the south and Fresno . . . on the north will be retained under this Alternative.  However, the majority of the trees within [the] Mall will be removed during the construction of standard streets along the remaining three block[s] of [the] Mall as well as the cross malls, as well as those trees found unsuitable for preservation.  The removal of the trees will result in a short-term significant visual alteration to the existing views within [the] Mall.  This Alternative could include the installation of replacement trees; however, similar to Project Options 1 and 2, the replacement trees would not reach maturity until [five] to 10 years, resulting in a short-term significant impact on the existing visual character of the . . . Mall.  Since this Alternative would continue to provide visual relief as well as shade within three blocks of [the] Mall during construction activities, this Alternative would result in less short-term aesthetic impacts compared to Project Options 1 and 2; however, the short-term aesthetics impacts associated with this Alternative would remain significant and unavoidable.

"*Historical Resources*  [¶]  Under this Alternative, the features that contribute to the historic resource along three blocks of the Fulton alignment would be restored and rehabilitated consistent with the Secretary of the Interior Standards for the Rehabilitation of Historic Properties.  However, since standard streets will be installed within the majority of the . . . Mall, the integrity of the . . . Mall as a historical resource is not expected to remain.  Therefore, [the] Mall is not expected to remain a[] historical resource on the [CRHR].  Similar to Project Options 1 and 2, the implementation of this Alternative would result in a significant and unavoidable impact on a[] historical resource.  [¶] . . . [¶]

"*Conclusion and Relationship to Project Objectives*  [¶]  This Alternative would result in less impacts to aesthetics . . . .  Similar to Project Options 1 and 2, this Alternative is expected to result in a significant and unavoidable impact on a[] historical resource.  Overall, this Alternative would be environmentally superior compared to the proposed [P]roject.

64.

"This Alternative would provide an increase in access to portions of the Mall; however, this increase could only be provided on the portions of the Mall that include streets. This Alternative could provide parking within those areas proposed with streets; however, [it] would not provide parking along the entire Fulton alignment. This Alternative would provide for multi-modal access options, but not along the entire Fulton alignment. The addition of the northernmost and southernmost blocks and the cross streets would provide increased visibility to a portion of the businesses, offices, and other amenities along the Fulton alignment. Although limited visibility is provided under this Alternative, it would not add on-street parking along the entire length of the Fulton . . . alignment. This Alternative could provide a greater public use of the Mall compared to existing conditions; however, the use of the Mall is expected to be less than the placement of a two-way, two-lane street along the entire length of the Fulton alignment and the cross streets. . . . [T]his Alternative is expected to reduce ground floor vacancies and increase annual gross retail sales within the Mall. However, this Alternative is not expected to result in as much of a reduction as Project Options 1 and 2 and as much of an increase in annual gross retail sales as Options 1 and 2 because Project Options 1 and 2 include[] the installation of a two-way, two[-]lane street as well as parking along the entire Fulton alignment. This Alternative would not maximize sustainable development and economic productivity in conjunction with other downtown redevelopment projects while complying with the requirement to receive federal transportation grant funds to minimize harm to the historic site resulting from the Project. This Alternative would provide greater public use of the Mall compared to existing conditions; however, the long-term public use of the Mall may not be greater than Project Options 1 and 2. The current federal grants secured by the City for the . . . Project would not qualify for use by this Alternative. Transportation projects throughout the City each year have been funded through federal, State, and local funds and no direct funds from the City['s] . . . General Fund because the City does not allocate General Fund monies for transportation projects within the City. At this time, City staff is unaware of funding sources that are available to fund this Alternative, and there is no reasonable expectation to obtain funding for this Alternative."

The draft EIR was circulated for public review from November 27, 2013, to January 13, 2014. Thereafter, City received and responded to various comments and prepared a final EIR.

On February 27, 2014, City Council certified the final EIR, made written findings for each significant environmental effect identified,[36] and approved the Project. It selected Option 1 as the "preferred build alternative":

"[C]ompared to Option 2, Option 1 provides greater benefits with respect to safety, in that the straight street that Option 1 creates will be easier for drivers to navigate and understand; and the greater number of on-street parking spaces will serve to slow vehicle traffic while providing a consistent buffer between vehicles on the street and pedestrians on the sidewalk . . . .

". . . [C]ompared to Option 2, Option 1 provides greater benefits with respect to economics and functionality, in that Option 1 creates approximately 190 new on-street parking spaces within the . . . Mall area, as opposed to approximately 82 spaces in Option 2; these on-street parking spaces can double as vendor booth spaces during events, accommodating more event activity; the ease of navigating the straight street accommodates more scanning by drivers of the area's sidewalks and storefronts; and the straight street layout accommodates larger delivery vehicles . . . .

". . . [C]ompared to Option 2, Option 1 provides greater benefits with respect to the pedestrian experience and landscape character, in that Option 1 creates a consistent area of at least 28 feet in width for pedestrian travel, artwork, and seating, better maintaining the linear feel of a pedestrian mall; Option 1 provides more space for new artwork to be installed over time; the uniformly wide 28-foot promenade area creates more opportunities to plant trees away from basements and provide afternoon shade to the eastern sidewalk; the rescaled fountains more typical of Option 1 will better fit proportionally with the width of this promenade reduced from 80 feet; the straight street of Option 1 never creates the illusion of vehicles driving toward the sidewalk near curves, as can occur in Option 2; and Option 1 avoids the narrow sidewalks that occur in several instances in Option 2 . . . .

". . . [C]ompared to Option 2, Option 1 provides greater benefits with respect to construction and maintenance, in that rescaled fountains may reduce maintenance costs and energy and water use over time; smaller transit and paratransit vehicles may find the straight streets with more

---

[36] City Council adopted a statement of overriding considerations.

parking spaces easier to navigate; and the consistent curb line avoids narrow sidewalks over building basements . . . .  [¶] . . . [¶]

". . . Option 1 meets the basic, identified [P]roject objectives, including maximization of economic productivity, improved multimodal circulation and access, greater public use, and the ability to fund the reconstruction with sources other than the . . . General Fund . . . ."**37**

## DISCUSSION

**I.    Collateral Estoppel.**

Caltrans, acting on behalf of the FHWA, approved federal funds for the Project in May 2014.  Thereafter, Coalition, inter alios, filed an action under the federal Administrative Procedure Act (5 U.S.C. § 701 et seq.), alleging Caltrans**38** violated NEPA by not preparing an environmental impact statement, and violated Section 4(f) of the Federal Transportation Act by preparing a deficient environmental assessment of the Project's use of historic sites and public parks.  (*Bitters*, *supra*, 2016 U.S.Dist. Lexis 4400, at pp. 1-2.)  On January 12, 2016, the United States District Court for the Eastern District of California denied Coalition's motion for summary judgment and granted Caltrans' and City's motions for summary judgment.  (*Id.* at pp. 3, 71.)

City now asserts Coalition "is collaterally estopped from litigating most, if not all, issues" raised in the instant case because "those issues have already been decided" in *Bitters*.  City contends the federal standard for collateral estoppel applies.  Under federal law, collateral estoppel applies if, inter alia, " ' "the issue at stake [is] identical to the one alleged in the prior litigation." ' " (*McQuillion v. Schwarzenegger* (9th Cir. 2004) 369 F.3d 1091, 1096; see *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [collateral

---

**37**    These findings were based on Royston, Hanamoto, Alley & Abey's comparative analysis of Options 1 and 2 in its November 13, 2013, report.  (See *ante*, at p. 8, fn. 10.)

**38**    Under NEPA and Section 4(f) of the Federal Transportation Act (49 U.S.C. § 303(c)), Caltrans, not the city, was the lead agency.  (*Bitters v. Federal Highway Admin.* (E.D.Cal. Jan. 12, 2016, No. 1:14-cv-01646-KJM-SMS) 2016 U.S.Dist. Lexis 4400, p. 17 & fn. 13 (*Bitters*).)

estoppel applies when "the issue sought to be precluded from relitigation [is] identical to that decided in a former proceeding"].) City claims the issues at stake are identical because the Project is the same, the alleged defects in the environmental investigation by Caltrans and by City are the same, and the standard of review of lead agency investigation is the same under NEPA and CEQA.

We find the issues at stake are not identical. Here, Coalition filed the writ petition challenging lead agency City's actions under CEQA and appealed from the trial court's decision that City's EIR complied with CEQA. The sole defendant in this case is City. In *Bitters*, the defendants were City, the FHWA, the administrator of the FHWA, Caltrans, the director of Caltrans, the DOT, and the director of the DOT. The federal district court acknowledged the defendants "undertook several environmental review processes to evaluate the development options for the Fulton Mall," but the two at issue were "the NEPA and Section 4(f) processes." (*Bitters*, *supra*, 2016 U.S.Dist. Lexis 4400, at p. 12.) Coalition did not bring any CEQA claims in the federal action and the federal district court did not evaluate or rule on the adequacy of City's actions under CEQA.

City argues, however, the federal district court's ruling regarding NEPA and Section 4(f) compliance by Caltrans precludes us from determining whether City complied with CEQA because "CEQA was modeled after . . . NEPA, and courts routinely look to case law interpretations of NEPA as persuasive authority in CEQA cases." No authority is cited, however, for the proposition a federal district court ruling on NEPA and Section 4(f) compliance precludes a state court ruling on CEQA compliance. Furthermore, Coalition points to two parallel federal and state court rulings regarding the sufficiency of environmental reviews of projects under NEPA and CEQA: (1) *Laub v. U.S. Dept. of Interior* (9th Cir. 2003) 342 F.3d 1080 and *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143 [environmental evaluation of the CALFED Bay-Delta Program]; and (2) *Center for Biol. Diver. v. Federal Highway Admin.* (S.D.Cal. 2003) 290 F.Supp.2d 1175

and *National Enterprises, Inc. v. State Dept. of Transportation* (Feb. 27, 2008, No. D050411) [nonpub. opn.] [State Route 125 South toll road construction project].

The issue before us—i.e., City's compliance with CEQA—is not identical to the issues ruled on in *Bitters*. Collateral estoppel does not preclude the litigation in this case.

## II. Overview of CEQA.

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112 (*Mountain Lion*), citing § 21001.) The statute "contains a 'substantive mandate' requiring public agencies to refrain from approving projects with significant environmental effects if 'there are feasible alternatives or mitigation measures' that can substantially lessen or avoid those effects." (*County of San Diego v. Grossmont-Cuyamaca Community College Dist.* (2006) 141 Cal.App.4th 86, 98, italics omitted, quoting *Mountain Lion*, *supra*, at p. 134; accord, §§ 21002, 21081.)

"Whenever a project may have a significant and adverse physical effect on the environment, an EIR must be prepared and certified."[39] (*Mountain Lion*, *supra*, 16 Cal.4th at p. 113, citing § 21100, subd. (a); accord, § 21151, subd. (a).) "The steps in the process include the preparation of a draft EIR; the circulation of that draft for comment; the preparation of a final EIR which responds to those comments; and the certification that the final EIR has been completed in compliance with CEQA." (*Sunset Drive Corp.*

---

[39] The lead agency, i.e., the public agency principally responsible for carrying out or approving a project (Guidelines, § 15367), will normally take up to three separate steps in deciding which document to prepare for the project (*id.*, § 15002, subd. (k)). In the first step, the agency determines whether the project is subject to CEQA. If the project is exempt, the inquiry ends and the agency may prepare a notice of exemption. (Guidelines, § 15002, subd. (k)(1).) If the project is not exempt, the agency takes the second step and conducts an initial study. If the study shows there is no substantial evidence that the project may have a significant environmental effect, the inquiry ends and the agency prepares a negative declaration. (*Id.*, subd. (k)(2).) If the study shows otherwise, the agency takes the third step and prepares an EIR. (*Id.*, subd. (k)(3).)

69.

*v. City of Redlands* (1999) 73 Cal.App.4th 215, 220.)  The EIR "is the mechanism prescribed by CEQA to force informed decision making and to expose the decision making process to public scrutiny."  (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 910.)  As " 'the heart of CEQA' " (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 392, quoting Guidelines, § 15003, subd. (a)), the EIR "provides the public and responsible government agencies with detailed information on the potential environmental consequences of an agency's proposed decision," and "describes ways to minimize significant environmental effects, and suggests alternatives to the project, including the option of 'no project' " (*Mountain Lion*, *supra*, 16 Cal.4th at p. 113, citing § 21061; accord, § 21002.1, subd. (a)).

" 'CEQA does not, indeed cannot, guarantee that [governmental] decisions will always be those which favor environmental considerations.' [Citation.] 'If economic, social, or other conditions make it infeasible to mitigate one or more significant effects on the environment of a project, the project may nonetheless be carried out or approved at the discretion of a public agency if the project is otherwise permissible under applicable laws and regulations.' [Citation.] 'CEQA recognizes that in determining whether and how a project should be approved, a public agency has an obligation to balance a variety of public objectives, including economic, environmental, and social factors . . . .' [Citation.] While 'CEQA requires the decision-making agency to balance, as applicable, the economic, legal, social, technological, or other benefits . . . of a proposed project against its unavoidable environmental risks when determining whether to approve the project,' 'the adverse environmental effects may be considered "acceptable" ' '[i]f the specific economic, legal, social, technological, or other benefits . . . of a proposal project outweigh the unavoidable adverse environmental effects . . . .' [Citation.]" (*Cedar Fair, L.P. v. City of Santa Clara* (2011) 194 Cal.App.4th 1150, 1174.)

### III. Standard of review.

Coalition emphasizes "City failed to proceed as required by law and failed to comply with CEQA's information disclosure requirements. To the extent . . . City made a 'factual' finding that the EIR complied with CEQA's informational disclosure requirements, [Coalition] maintains that the finding is based upon faulty interpretations of CEQA's substantive and procedural mandates." (Fn. omitted.)

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' " (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426 (*Vineyard*), quoting § 21168.5.) "Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard*, *supra*, at pp. 426-427.)

"[A] reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Vineyard*, *supra*, 40 Cal.4th at p. 435.) "[W]e determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation] . . . ." (*Vineyard*, *supra*, 40 Cal.4th at p. 435.) For instance, "[w]hen an agency fails to include information mandated by CEQA in the environmental analysis, the agency fails to proceed in a manner required by law." (*San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 12 (*San Diego Citizenry Group*); cf. *ibid.* ["[W]here the agency includes the relevant information, but the [factual] *adequacy* of the information is disputed, the question is one of substantial evidence."]; see *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1392 ["[T]he existence of substantial evidence supporting the agency's ultimate decision on a disputed issue is not relevant when one is assessing a violation of the information disclosure provisions of CEQA."].) "The determination of

71.

whether an agency has proceeded in the manner required by law is based on a review of the record as a whole: 'Where some facts show a failure to comply, but the record as a whole supports a finding of compliance, courts should find compliance based on the evidence in the whole record.' [Citations.]" (*San Diego Citizenry Group*, *supra*, at pp. 12-13.)

An EIR is presumed adequate under CEQA and a petitioner in a CEQA action has the burden of proving otherwise. (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 924-925; *Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 836.)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: [t]he appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard*, *supra*, 40 Cal.4th at p. 427; see *Association of Irritated Residents v. County of Madera*, *supra*, 107 Cal.App.4th at p. 1390 [" 'The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it.' "].)

## IV.    Analysis.

a.  *City did not prematurely approve the Project in advance of CEQA review.*[40]

"A claim . . . that the lead agency approved a project with potentially significant environment effects before preparing and considering an EIR for the project 'is predominantly one of improper procedure' [citation] to be decided by the courts

---

[40]    City argues this issue cannot be raised here because Coalition did not previously bring a validation action pursuant to Code of Civil Procedure section 863. However, City fails to cite the provision of law requiring a validation proceeding in this instance. (See Code Civ. Proc., § 860; *Fontana Redevelopment Agency v. Torres* (2007) 153 Cal.App.4th 902, 909 ["The validation procedure must be separately authorized by another statute other than the general validation statute itself . . . ."].)

72.

independently. The claim goes not to the validity of the agency's factual conclusions but to the required timing of its actions." (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 131, italics omitted (*Save Tara*).)

"Under CEQA, local agencies must prepare or cause to be prepared, certify as complete, and consider a final EIR *before* approving or disapproving any project they propose to 'carry out or approve,' if the project may have significant environmental effects. [Citations.]" (*Neighbors for Fair Planning v. City and County of San Francisco* (2013) 217 Cal.App.4th 540, 547; accord, *Laurel Heights I*, *supra*, 47 Cal.3d at p. 394.) " 'Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (Guidelines, § 15352, subd. (a).)

The challenge is determining "when an agency's [decision] ripens into a 'commit[ment]' " "required under [CEQA] to have been preceded by preparation of an EIR." (*Save Tara*, *supra*, 45 Cal.4th at pp. 122, 130.) Our Supreme Court provided direction in *Save Tara*.[41] In that case, Laurel Place, a nonprofit developer, proposed to construct affordable senior housing on property owned by the City of West Hollywood. (*Save Tara*, *supra*, at p. 122.) The property in question, identified as 1343 Laurel, contained a historic main house, chauffeur's house, and garage. (*Ibid.*) The main house had been converted into four apartments, which were still occupied by tenants. (*Id.* at pp. 122-123.) Laurel Place planned to preserve but repurpose the main house and replace the chauffeur's house and garage with a three-story building. (*Id.* at pp. 122, 125.)

On May 3, 2004, the city council authorized a draft agreement to (1) convey 1343 Laurel to Laurel Place for the express purpose of " 'caus[ing] the reuse and redevelopment of [1343 Laurel] with affordable housing for seniors' "; and (2) loan

---

[41] Although *Save Tara* dealt with a private project (see Guidelines, § 15377), "the principles [it] articulate[d] apply equally to public projects" (*City of Irvine v. County of Orange* (2013) 221 Cal.App.4th 846, 859 (*Irvine*)).

73.

$1 million to Laurel Place to " 'facilitate development of the project and begin[] the process of working with [1343 Laurel's existing] tenants to explore relocation options.' " (*Save Tara*, *supra*, 45 Cal.4th at p. 124). Nearly half of this loan, i.e., $475,000, was to be advanced and used for environmental reports, governmental permits and fees, and other "predevelopment" items. (*Id.* at pp. 124, 125, 140.) In addition, tenant relocation was to be completed "before final project approval was given and the property conveyed . . . ." (*Id.* at p. 142, italics omitted.)

Under the draft agreement, the city's obligation to convey 1343 Laurel and lend money to Laurel Place was subject to several conditions, "among them that '[a]ll applicable requirements of CEQA . . . have been satisfied, as reasonably determined by the [c]ity [m]anager' and that '[the] [d]eveloper shall have obtained all [e]ntitlements.' " (*Save Tara*, *supra*, 45 Cal.4th at p. 124, fn. omitted.) However, "[t]he city manager . . . could waive these conditions" (*ibid.*) and "[t]he predevelopment portion of the loan . . . was not subject to the CEQA compliance or entitlement conditions" (*id.* at pp. 124-125).

The city would not approve a final EIR until October 2006 (*Save Tara*, *supra*, 45 Cal.4th at p. 127), nearly two and a half years after the city council authorized the draft agreement (*id.* at p. 124).

On July 12, 2004, Save Tara, a group composed of city residents opposing the project, petitioned for a writ of mandate, alleging "th[e] [c]ity had violated CEQA by failing to prepare an EIR before the city council's May 3[, 2004,] approval of the loan and draft agreement." (*Save Tara*, *supra*, 45 Cal.4th at p. 125.) On August 9, 2004, the city and Laurel Place executed a revised agreement (*ibid.*), which (1) abrogated the city manager's power to waive the CEQA compliance condition; (2) clarified "[the] [c]ity retained 'complete discretion over . . . any actions necessary to comply with CEQA' and . . . the agreement 'imposes no duty on [the] [c]ity to approve . . . any documents prepared pursuant to CEQA' "; and (3) indicated Laurel Place "was to begin the [tenant relocation] process by hiring a relocation consultant within 30 days." (*Id.* at p. 126,

italics omitted.) Save Tara's petition was treated as amended to address both the May 3, 2004, draft agreement and the August 9, 2004, revised agreement. (*Id.* at p. 125, fn. 5.)

The superior court denied the petition, reasoning an EIR "was [not] required before approving the May 3[, 2004,] draft agreement because 'the [a]greement is expressly conditioned on compliance with CEQA . . . [and] does not limit the project alternatives or possible mitigation measures.' " (*Save Tara*, *supra*, 45 Cal.4th at p. 126.) "Thus, [the] [c]ity 'has not given its final approval to convey the property at issue to [Laurel Place], nor has it given its final approval of the housing project itself.' " (*Ibid.*) The Second Appellate District reversed, countering (1) an EIR must be prepared "whenever lead agencies 'propose to approve or carry out' a project with potential significant effects" and " '[cannot] be delayed until a "final" decision has been made' "; and (2) "conditioning a development agreement on CEQA compliance is insufficient because the EIR review process 'is intended to be part of the decisionmaking process itself, and not an examination, after the decision has been made, of the possible environmental consequences of the decision.' " (*Ibid.*, italics omitted.) The appellate court opined: "Any question as to whether a particular point in the development process is too early for preparation of an EIR 'is resolved by the pragmatic inquiry whether there is enough information about the project to permit a meaningful environmental assessment. If the answer is yes, the EIR review process must be initiated.' " (*Ibid.*) Because "the project was well enough defined" "[b]efore May 3, 2004," "[the] [c]ity should have performed" "meaningful environmental analysis." (*Ibid.*)

On appeal, the Supreme Court declined to endorse either the superior court's " 'final approval' " standard or the Second Appellate District's "well enough defined" touchstone. It explained:

> "This court, like the . . . Guidelines, has . . . recognized two considerations of legislative policy important to the timing of mandated EIR preparation: (1) that CEQA not be interpreted to require an EIR before the project is well enough defined to allow for meaningful environmental

evaluation; and (2) that CEQA not be interpreted as allowing an EIR to be delayed beyond the time when it can, as a practical matter, serve its intended function of informing and guiding decision makers. [¶] . . . To be consistent with CEQA's purposes, the line must be drawn neither so early that the burden of environmental review impedes the exploration and formulation of potentially meritorious projects, nor so late that such review loses its power to influence key public decisions about those projects. [¶] . . . [¶]

"The May 3[, 2004,] draft agreement and August 9[, 2004,] executed agreement conditioned [the] [c]ity's obligation to convey the property to Laurel Place for development on all applicable requirements of CEQA having been satisfied. [The] [c]ity and Laurel Place contend such a CEQA compliance condition on an agreement to convey or develop property eliminates the need for preparation of an EIR (or any other CEQA document) before an agency approves the agreement. In contrast, Save Tara . . . maintains that permitting a CEQA compliance condition to postpone environmental review until after an agreement on the project has been reached would render the EIR requirement a 'dead letter.' We adopt an intermediate position: [a] CEQA compliance condition can be a legitimate ingredient in a preliminary public-private agreement for exploration of a proposed project, but if the agreement, viewed in light of all the surrounding circumstances, commits the public agency as a practical matter to the project, the simple insertion of a CEQA compliance condition will not save the agreement from being considered an approval requiring prior environmental review. [¶] . . . [¶]

"[The] [c]ity and Laurel Place apparently would limit the 'commit[ment]' that constitutes approval of a private project for CEQA purposes [citation] to unconditional agreements irrevocably vesting development rights. . . . On this theory, any development agreement, no matter how definite and detailed, even if accompanied by substantial financial assistance from the agency and other strong indications of agency commitment to the project, falls short of approval so long as it leaves final CEQA decisions to the agency's future discretion. [¶] . . . [¶] . . . [L]imiting approval to unconditional agreements that irrevocably vest development rights would ignore what we have previously recognized, that postponing environmental analysis can permit 'bureaucratic and financial momentum' to build irresistibly behind a proposed project, 'thus providing a strong incentive to ignore environmental concerns.' [Citation.]

"A public entity that, in theory, retains legal discretion to reject a proposed project may, by executing a detailed and definite agreement with

76.

the private developer and by lending its political and financial assistance to the project, have as a practical matter committed itself to the project. When an agency has not only expressed its inclination to favor a project, but has increased the political stakes by publicly defending it over objections, putting its official weight behind it, devoting substantial public resources to it, and announcing a detailed agreement to go forward with the project, the agency will not be easily deterred from taking whatever steps remain toward the project's final approval. [¶] . . . [¶]

"We note as well that postponing EIR preparation until after a binding agreement for development has been reached would tend to undermine CEQA's goal of transparency in environmental decisionmaking. Besides informing the agency decision makers themselves, the EIR is intended 'to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its actions.' [Citations.] When an agency reaches a binding, detailed agreement with a private developer and publicly commits resources and governmental prestige to that project, the agency's reservation of CEQA review until a later, final approval stage is unlikely to convince public observers that before committing itself to the project the agency fully considered the project's environmental consequences. Rather than a 'document of accountability' [citation], the EIR may appear, under these circumstances, a document of post hoc rationalization.[42]

"On the other hand, we cannot agree with the suggestion . . . that any agreement, conditional or unconditional, would be an 'approval' requiring prior preparation of CEQA documentation if at the time it was made the project was sufficiently well defined to provide ' "meaningful information for environmental assessment." ' [Citation.] On this theory, once a private project had been described in sufficient detail, *any* public-private agreement related to the project would require CEQA review.

". . . Agencies sometimes provide preliminary assistance to persons proposing a development in order that the proposal may be further explored, developed[,] or evaluated. Not all such efforts require prior CEQA review. [Citation.] Moreover, privately conducted projects often

---

**42** The Supreme Court also noted the city and Laurel Place's preferred rule was not consistent with section 15352, subdivision (b), of the Guidelines. (*Save Tara*, *supra*, 45 Cal.4th at p. 134; see Guidelines, § 15352, subd. (b) ["With private projects, approval occurs upon the *earliest* commitment to issue or the issuance by the public agency of a discretionary contract, grant, subsidy, loan, or other form of financial assistance, lease, permit, license, certificate, or other entitlement for use of the project." (italics added)].)

77.

need some form of government consent or assistance to get off the ground, sometimes long before they come up for formal approval. Approval, within the meaning of [CEQA], cannot be equated with the agency's mere interest in, or inclination to support, a project, no matter how well defined. 'If having high esteem for a project before preparing an . . . EIR . . . nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed toward it.' [Citation.]

". . . [C]ities often reach purchase option agreements, memoranda of understanding, exclusive negotiating agreements, or other arrangements with potential developers, especially for projects on public land, before deciding on the specifics of a project. Such preliminary or tentative agreements may be needed in order for the project proponent to gather financial resources for environmental and technical studies, to seek needed grants or permits from other government agencies, or to test interest among prospective commercial tenants. While we express no opinion on whether any particular form of agreement . . . constitutes project approval, we take the . . . point that requiring agencies to engage in the often lengthy and expensive process of EIR preparation before reaching even preliminary agreements with developers would unnecessarily burden public and private planning. CEQA review was not intended to be only an afterthought to project approval, but neither was it intended to place unneeded obstacles in the path of project formulation and development." (*Save Tara*, *supra*, 45 Cal.4th at pp. 130-132, 134-137, fns. omitted.)

Accordingly, the Supreme Court promoted a fact-sensitive inquiry:

"Desirable . . . as a bright-line rule defining when an approval occurs might be, neither of those proposed . . . is consistent with CEQA's interpretation and policy foundation. Instead, we apply the general principle that before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' [Citations.]

"In applying this principle to conditional development agreements, courts should look not only to the terms of the agreement but to the surrounding circumstances to determine whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project. [Citation.] In this analysis, the contract's conditioning of final approval on CEQA compliance

is relevant but not determinative." (*Save Tara*, *supra*, 45 Cal.4th at pp. 138-139.)

Applying the aforementioned balancing test, the Supreme Court concluded the authorization of the May 3, 2004, draft agreement and the execution of the August 9, 2004, revised agreement constituted an approval that should have been prefaced by an EIR. (*Save Tara*, *supra*, 45 Cal.4th at pp. 121-122, 140.) The high court pointed to the contractual language, which (1) "forthrightly stated the[] purpose was to 'cause the reuse and redevelopment' of 1343 Laurel in accordance with the project" (*id.* at p. 140); (2) advanced nearly half of a $1 million loan to Laurel Place without conditioning the outlay on CEQA compliance, meaning the city risked wasting $475,000 "unless [it] gave final approval to the project in some form" (*Save Tara*, *supra*, at p. 140); and (3) specified the relocation of 1343 Laurel's preexisting tenants would be completed "*before* final project approval was given and the property conveyed to Laurel Place" (*id.* at p. 142). In particular, the Supreme Court considered tenant relocation "a significant step in [the] redevelopment project's progress" "likely to be irreversible" and found the city's "willingness to begin that process as soon as the conditional development agreement was executed, and to complete it before certifying an EIR and finally approving the project, tends strongly to show th[e] [c]ity's commitment to the 1343 Laurel project was not contingent on review of an EIR." (*Ibid.*)

The high court also examined the rest of the administrative record and found indicia of the city's commitment predating the authorization of the May 3, 2004, draft agreement: (1) the city manager facilitated Laurel Place's 2003 HUD grant application by informing the federal agency in a June 10, 2003, letter that the city " 'has approved the sale of the property' and 'will commit' up to $1 million in financial aid" (*Save Tara*, *supra*, 45 Cal.4th at pp. 122-123, 141); (2) shortly after Laurel Place received a $4.2 million HUD grant in late 2003, the mayor and the city's newsletter publicly announced the funding was earmarked for the construction of affordable senior housing

at 1343 Laurel (*id.* at pp. 123, 141); (3) in late 2003, the city's housing manager and relocation consultants informed 1343 Laurel's preexisting tenants that they would be evicted in approximately one year (*id.* at pp. 123, 142); (4) in January 2004, city officials told residents opposing the project "that while 'variations' on the proposal would be entertained, [the] [c]ity 'must continue on a path that fulfills this obligation' to redevelop the property for senior housing" " 'inasmuch as the [c]ity and [Laurel Place] have been awarded a $4.2 million federal grant to help develop this project for senior housing' " (*id.* at pp. 123, 141); and (5) at a May 3, 2004, city council meeting, the city's housing manager remarked that "while there were 'options to consider' regarding the project design, options for other uses of the property . . . had already been ruled out" (*id.* at pp. 141-142; see *id.* at p. 125).

Finally, the Supreme Court deemed the CEQA compliance provision ineffectual because (1) the language that "all 'requirements of CEQA' be 'satisfied . . .' arguably left open the question whether [the] [c]ity remained free to find that the EIR was legally adequate and yet . . . reject the project on substantive environmental grounds" since "[a]n EIR that 'satisfies' CEQA 'requirements' may nonetheless demonstrate the project carries with it significant immitigable adverse effects" (*Save Tara*, *supra*, 45 Cal.4th at pp. 140-141); and (2) the question of "whether CEQA requirements had been met was to be 'reasonably determined by the [c]ity manager' " (*id.* at p. 140), but the agreement "had no provision for appealing to the city council the city manager's decision on, or waiver of, CEQA compliance" (*id.* at p. 141), amounting to an impermissible delegation of the city council's legal responsibility to assess environmental impacts (*ibid.*).[43]

---

[43] The Supreme Court discounted the city's attempt to correct these faults in the August 9, 2004, revised agreement, emphasizing "the city council had already approved the May 3[, 2004,] draft agreement . . . [and] shown a willingness to give up further authority over CEQA compliance in favor of dependence on the city manager's determination." (*Save Tara*, *supra*, 45 Cal.4th at p. 141.) The high court continued: "Given that history, as well as the other circumstances discussed . . . , [the] [c]ity's

In the instant case, Coalition claims City " 'as a practical matter . . . committed itself to the [P]roject . . . so as to effectively preclude' any full or partial restoration alternative" "due to the constraints of federal funding," namely those of the TIGER grant. Coalition adds "City's actions to secure the grant funding effectively precluded a project formulation that featured the full or partial restoration of the . . . Mall."

To the extent Coalition suggests a lead agency's pursuit and procurement of funding for a proposed project necessarily constitutes an approval that was "required under [CEQA] to have been preceded by preparation of an EIR" (*Save Tara*, *supra*, 45 Cal.4th at p. 122; see *id.* at p. 130), we disagree. As previously mentioned, CEQA "contains a 'substantive mandate' requiring public agencies to refrain from approving projects with significant environmental effects if 'there are *feasible* alternatives or mitigation measures' that can substantially lessen or avoid those effects. [Citations.]" (*County of San Diego v. Grossmont-Cuyamaca Community College Dist.*, *supra*, 141 Cal.App.4th at p. 98, some italics omitted.) " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account *economic*, environmental, legal, social, and technological factors." (Guidelines, § 15364, italics added; accord, §§ 21061.1, 21081, subd. (a)(3); Guidelines, §§ 15126.6, subd. (f)(1), 15131, subd. (c); see *Concerned Citizens of South Central L.A.*, *supra*, 24 Cal.App.4th at p. 841 ["[CEQA] does not demand what is not realistically possible, given the limitation of time, energy[,] and *funds*." (italics added)].) Given the availability of funding is clearly relevant to the question of economic feasibility, i.e., whether the difference between the cost of a proposed project and the cost of an alternative is " 'so great that a reasonably prudent [person] would not proceed with the [alternative]' " (*Sustainability, Parks, Recycling & Wildlife Legal Defense Fund v. San Francisco Bay*

'apprehensive citizenry' [citation] could be forgiven if they were skeptical as to whether the city council would give adverse impacts disclosed in the EIR full consideration before finally approving the project." (*Ibid.*)

*Conservation & Development Com.* (2014) 226 Cal.App.4th 905, 918), we find untenable an interpretation of CEQA that dissuades a project proponent from marshaling financial resources until *after* the EIR process is fully completed. (See Guidelines, § 15126.6, subd. (a) ["An EIR shall describe a range of reasonable alternatives to the project, . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project . . . . An EIR need not consider every conceivable alternative to a project. Rather[,] it must consider a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation."].) As the Supreme Court proclaimed, "the line must [not] be drawn . . . so early that the burden of environmental review impedes the exploration and formulation of potentially meritorious projects . . . ." (*Save Tara*, *supra*, 45 Cal.4th at pp. 130-131.)

Nonetheless, we acknowledge a public agency may be found to have prematurely approved a project in advance of CEQA review if an "examin[ation] [of] the terms of the [funding] [a]pplication and the surrounding circumstances" (*Irvine*, *supra*, 221 Cal.App.4th at p. 860) demonstrates the agency was "committed . . . to the [project] in a manner that effectively precluded it from considering any project alternatives or mitigation measures under CEQA" (*ibid.*). We find instructive the Fourth Appellate District's decision in *Irvine*.[44]

In *Irvine*, the County of Orange sought to expand James A. Musick Facility, a minimum security jail the county operated on unincorporated land adjacent to the City of Irvine. (*Irvine*, *supra*, 221 Cal.App.4th at p. 851.) In 2007, the Legislature passed Assembly Bill No. 900, which "provide[d] funding for local jail construction in two

---

[44] Coalition argues *Irvine* is irrelevant because the case "is about the need for supplemental environmental review, not environmental review in the first instance, as here." While we recognize *Irvine* involved a supplemental EIR, the Fourth Appellate District's holding was based on CEQA principles applicable to EIR's in general.

82.

separate phases [i.e., Phases I and II] . . . ." (*Irvine*, *supra*, at p. 852.) During Phase I, counties were "allowed . . . to apply for a portion of approximately $750 million." (*Ibid.*) During Phase II, counties were "allowed . . . to apply for a portion of an additional $470 million," provided they "reached certain benchmarks under Phase I." (*Ibid.*) In 2011, the Legislature amended Phase II's funding provisions by "increas[ing] the amount of funds available . . . to nearly $603 million" and "eliminat[ing] [the] requirement that counties reach various benchmarks before receiving state funds." (*Ibid.*)

The county completed an application for $100 million in Phase II state funds, which required a statement of need, a description of the proposed expansion, and budget, construction and operation plans. (*Irvine*, *supra*, 221 Cal.App.4th at pp. 853, 861.) On December 6, 2011, well before the environmental impacts of the proposed project were assessed, the county's board of supervisors authorized the execution and submission of the Phase II application. (*Id.* at p. 853.) The city petitioned for a writ of mandate, claiming the board's action constituted an approval under CEQA and should have been preceded by CEQA. (*Irvine*, *supra*, at p. 853.) The superior court denied the petition. (*Ibid*.)

On appeal, the Fourth Appellate District applied *Save Tara*'s " 'intermediate position' . . . examin[ing] the totality of the circumstances and the practical effect of the public agency's action on its ability and willingness to modify or reject the proposed project" (*Irvine*, *supra*, 221 Cal.App.4th at p. 857) and concluded "[n]othing in the [c]ounty's [Phase II] application, or the state's later conditional award to the [c]ounty, committed the [c]ounty to the Musick Facility expansion in a manner that effectively precluded the [c]ounty from considering any project alternatives or mitigation measures that CEQA otherwise required" (*id.* at p. 863). First, "[t]he state's Request for Applications made clear the [c]ounty would receive only a 'conditional award' if the state approved the [c]ounty's application" (*id.* at p. 861), meaning the county's Phase II application "was merely a preliminary step that, if approved by the state, would authorize

the [c]ounty and the state to explore and evaluate the possibility of expanding the Musick Facility" "using state funds" (*id.* at pp. 861, 863; see *id.* at pp. 862-863). Second, "the [c]ounty, not the state, is designated as the lead agency responsible for complying with CEQA" (*id.* at p. 861) and "therefore [retains] . . . discretion to determine whether and how to mitigate any significant environmental impacts associated with the Musick Facility expansion and which alternatives, if any, to consider or adopt during the CEQA process" (*ibid.*). Third, "[t]he state did not require any form of CEQA documentation as part of the [c]ounty's Phase II [a]pplication" (*id.* at p. 862) and "the state's tentative project schedule . . . does not require the [c]ounty to provide documentation of CEQA compliance until approximately one year after receiving its conditional award" (*ibid.*). These facts outweighed those showing (1) the board made certain requisite assurances to the state in its resolution authorizing the execution and submission of the Phase II application (*id.* at pp. 863-864); (2) the county dedicated "substantial" "human and financial resources to developing the . . . expansion plan and preparing the Phase II [a]pplication" (*id.* at pp. 864-865); and (3) the Phase II application provided a "high level of detail . . . regarding its . . . Musick Facility expansion plan" (*id.* at p. 865).

In view of *Save Tara* and *Irvine*, we conclude City's pursuit and procurement of federal funding did not significantly further the Project in a manner that forecloses meaningful CEQA review. Like the Phase II funds in *Irvine*, the TIGER grant awarded to City in September 2013 was conditional. The grant would not be obligated by DOT until City established the Project would comply with all local, state, and federal requirements by June 30, 2014, including CEQA, signifying the money could be returned if the Project fell through.[45] Like the county in *Irvine*, City was not required to submit CEQA documentation or otherwise finish environmental review before it applied for and received the TIGER grant. In fact, City had nearly 10 months following receipt of the

---

[45] Similarly, the TCSP funds could also be returned. (See *ante*, p. 13.)

84.

grant to do so. Furthermore, nothing in the DOT's "Notice of Funding Availability" suggested City no longer had the discretion to reject the Project. Given this context, the fact that City's highly detailed application provided assurances of project readiness—i.e., by confirming the availability of matching funds, anticipating the EIR process would be completed before the obligation deadline, and appending letters of support from the mayor,[46] federal and state officials, property and business owners, and community leaders—was less indicative of a binding commitment to the Project and more indicative of showing City "ha[d] the ability to [proceed] and w[ould] follow [DOT]'s procedures." (*Irvine*, *supra*, 221 Cal.App.4th at p. 864.)

Other circumstances militated against a finding of premature approval. From the time when Option 3 was introduced in the draft FCSP, City consistently represented that it would be subjected to CEQA review. (See *ante*, pp. 5-6 & fns. 8, 10.) Indeed, instead of foreclosing review, the EIR considered and rejected Option 3 because it (1) would fail to satisfy most of the project objectives, such as increasing mobility and multi-modal access in the Mall area; raising the visibility of Mall businesses, offices, and amenities; maximizing economic productivity; and securing funding (see *Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 353; *Rialto Citizens for Responsible Growth v. City of Rialto*, *supra*, 208 Cal.App.4th at p. 949 [agency may reject an alternative as infeasible because it cannot meet project objectives]; accord, Guidelines, § 15126.6, subd. (c)); and (2) would be economically infeasible (see *The Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202 Cal.App.4th 603, 623

---

[46] Although the mayor may make recommendations to City Council (see Fresno City Charter, article IV, § 400, subd. (j)), she cannot compel City Council to accept them (see *ante*, p. 5 & fn. 12).

[agency may reject an alternative of economic infeasibility]).**[47]** By contrast, before conducting CEQA review, the public agency in *Save Tara* preemptively ruled out consideration of alternatives to the proposed senior housing construction project. Moreover, in *Save Tara*, *supra*, 45 Cal.4th 116 the public agency demonstrated its commitment to the proposed project was not contingent on CEQA review by preemptively (1) informing preexisting tenants at 1343 Laurel of their evictions; (2) entering into a development agreement with Laurel Place to relocate these tenants and otherwise advance the project; (3) agreeing to irrevocably loan $475,000 to Laurel Place; and (4) permitting the city manager to waive the requirement for CEQA compliance. Comparable facts do not exist in the instant case.

Finally, we reject Coalition's assertion the EIR was "nothing more than a post hoc rationalization for the [P]roject . . . ." (Italics omitted.) The EIR identified and analyzed the Project's significant environmental effects, mitigation measures, and alternatives. City solicited, considered, and responded to public feedback. In our view, City performed its obligations under CEQA reasonably, in good faith, and in accordance with the statute's intents and purposes. (Cf. *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 287-288.)

b. *The EIR was legally adequate*.

    i. As a matter of law, the EIR sufficiently addressed the Project's impacts on air quality, greenhouse gas emissions, parks, traffic, and utilities.

---

**[47]** The EIR evaluated and rejected Alternative 6.3.4 for the same reasons. Hence, we reject Coalition's ancillary contention that City improperly rejected Alternative 6.3.4.

Coalition cites *North Coast Rivers Alliance v. Kawamura* (2015) 243 Cal.App.4th 647 (*North Coast*), but that case is factually inapposite. In *North Coast*, which concerned the protection of California's native plants and agricultural crops from damage by an invasive moth species, the EIR *never* considered a control program of integrated pest management as a reasonable alternative to complete eradication. (See *id.* at pp. 652-654, 667-670.)

Coalition claims the EIR did not present a legally adequate analysis of the Project's effects on air quality, greenhouse gas emissions, parks, traffic, and utilities, contravening CEQA's information disclosure requirements. Coalition's argument, however, overlooks a critical detail: these effects were examined and deemed less than significant in City's initial study.[48] (See *ante*, at pp. 13-45.)

A lead agency must conduct an initial study to determine whether a project may have a significant effect on the environment. (Guidelines, § 15063, subd. (a); see *id.*, subd. (c)(3)(A)-(C) [initial study aids EIR preparation by focusing EIR on effects found to be significant, identifying effects found not to be significant, and explaining why certain effects were found not to be significant].) If any aspect of the project may cause a significant effect, the agency must prepare an EIR (*id.*, subd. (b)(1)(A)), which, in turn, "shall identify and focus on the *significant* environmental effects of the proposed project." (Guidelines, § 15126.2, subd. (a), italics added; accord, § 21100, subd. (b)(1); Guidelines, § 15143.) Where a particular effect is found *insignificant*, however, the EIR need only "briefly indicate the reasons for determining that the effect is not significant and therefore not discussing it in detail." (*Citizens to Preserve the Ojai v. County of Ventura* (1985) 176 Cal.App.3d 421 429; accord, §§ 21002.1, subd. (e), 21100, subd. (c); *Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109.) "Such a statement may be contained in an attached copy of an initial study." (Guidelines, § 15128; accord, § 15143; see 1 Kostka & Zischke, Practice

---

[48]    We point out Coalition does not challenge the initial study on appeal.

We need not afford the parties the opportunity to submit supplemental briefing pursuant to Government Code section 68081. (See *People v. Alice* (2007) 41 Cal.4th 668, 679 ["The parties need only have been given an opportunity to brief the issue decided by the court, and the fact that a party does not address an issue, mode of analysis, or authority that is raised or fairly included within the issues raised does not implicate the protections of [Government Code] section 68081."]; accord, *Mark v. Spencer* (2008) 166 Cal.App.4th 219, 228, fn. 4; *Plumas County Dept. of Child Support Services v. Rodriguez* (2008) 161 Cal.App.4th 1021, 1029, fn. 1.)

Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2015) § 8.7, p. 8-7 ["The provision for attaching a copy of the initial study is not mandatory, and the authors believe that inclusion of the initial study in the administrative record should be sufficient."].)

Here, City's initial study concluded the Project may have a significant effect on short-term visual character and historical resources. On the other hand, the initial study found impacts on air quality, greenhouse gas emissions, parks, traffic, and utilities not to be significant and presented extensive rationale for these determinations. (See *ante*, at pp. 13-45.) Hence, the initial study narrowed the scope of the EIR to focus on the Project's effects on short-term visual character and historical resources. (See Guidelines, § 15006, subds. (d) & (p).) As previously mentioned, with regard to insignificant effects, pertinent Guidelines and case law only require an EIR to succinctly discuss them. City complied by incorporating germane parts of the initial study into the text of the EIR and, for good measure, appending a copy of the study to the EIR. (See *ante*, p. 61.) It had no legal obligation to analyze insignificant effects in the EIR in the manner urged by Coalition.[49]

---

[49] At oral argument, Coalition asserted the EIR failed to comply with CEQA because the analyses of park and traffic impacts, inter alia, were not based on a proper baseline. It is true "[a]n EIR must include a description of the physical environmental conditions" "by which a lead agency determines whether an impact is significant." (Guidelines, § 15125, subd (a).) As noted, however, an EIR need only analyze those impacts deemed significant in the initial study. (See *id.*, §§ 15006, subd. (d), 15128, 15143.) In the instant case, impacts on parks and traffic were deemed insignificant in the initial study; hence, they were not required to be analyzed in the EIR. City's inclusion of the initial study's analyses on these matters in the EIR discharged its minimal obligation under CEQA to "mention[] only briefly issues other than significant ones in EIRs." (Guidelines, § 15006, subd. (p); accord, *id.*, § 15128.) Coalition essentially asks us to disregard the Guidelines, which we refuse to do. (*Sunset Sky Ranch Pilots Assn. v. County of Sacramento*, *supra*, 47 Cal.4th at p. 907, fn. 3 [Guidelines accorded great weight except where they are clearly unauthorized or erroneous].)

ii. With respect to its allegation the EIR did not sufficiently compare Options 1 and 2, Coalition failed to exhaust administrative remedies.

"An action or proceeding shall not be brought . . . unless the alleged grounds for noncompliance with [CEQA] were presented to the public agency orally or in writing by any person during the public comment period . . . or prior to the close of the public hearing on the project before the issuance of the notice of determination." (§ 21177, subd. (a); see *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285, 288-289, 291-292 [§ 21177, subd. (a), sets forth exhaustion-of-administrative-remedies requirement].) The petitioner bears the burden of proving the issue was initially raised at the administrative level. (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 909.)

City first asserted Coalition did not exhaust administrative remedies in its answer to Coalition's writ petition below. (See *Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1750 [respondent or real party in interest in CEQA action should raise exhaustion defense during writ proceeding in trial court].) On appeal, City renews this defense. Coalition maintains City was fairly apprised of its argument the EIR did not sufficiently compare Options 1 and 2 and directs us to certain correspondence received during the public comment period.[50] We reviewed these letters and cannot contemplate how they suggest the EIR did not sufficiently make this

---

[50] Coalition also states it "raised essentially the same issue in trial court briefs" dated July 21, 2014. However, this occurred nearly five months *after* issuance of the notice of determination. (See § 21177.)

comparison.**51** (See *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 282 ["[W]e do not perceive . . . unelaborated comment by a member of the public as fairly raising . . . [an] argument to the [public agency]. '[O]bjections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them.' "].)

"Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action" (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1199) and "failure to exhaust administrative remedies is a bar to relief in a California court" (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 495).

## DISPOSITION

The judgment is affirmed. Costs are awarded to respondent City of Fresno.

_____
DETJEN, J.

WE CONCUR:


_____
HILL, P.J.


_____
GOMES, J.

_____

**51** The remarks upon which Coalition relies include the following:

"The initial study required under CEQA for the current analyses of [the] Mall must address potential effects on the environment from each of the three [options] eligible for study . . . ."

"The EIR must include the actual number of sculptures, other artwork, water features, and trees, and Eckbo's landscape design to be destroyed by Options 1 and 2."

"Under either option returning traffic to [the] Mall . . . , I would like to see more of the existing trees preserved rather than replaced."

90.